38 F.3d 69
 James W. WETZLER, as Commissioner of Taxation and Finance of
the State of New York, and the New York State
Department of Taxation and Finance,
Plaintiffs-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of the
Seamen's Bank for Savings, F.S.B., Defendant-Appellee.
FEDERAL DEPOSIT INSURANCE CORPORATION, Counter-Claimant,
v.
James W. WETZLER and New York State Department of Taxation
and Finance, Counter-Defendants.
 No. 1273, Docket 93-9068.
 United States Court of Appeals,
Second Circuit.
 Argued March 30, 1994.
Decided Oct. 13, 1994.
 
 Frederic L. Lieberman, Asst. Atty. Gen. of the State of N.Y., New York City (G. Oliver Koppell, Atty. Gen. of the State of N.Y., of counsel), for plaintiffs-appellants James W. Wetzler and the New York State Dept. of Taxation and Finance.
 Kathleen V. Gunning, Counsel, F.D.I.C., Washington, DC (Ann S. Duross, Asst. Gen. Counsel, Robert D. McGillicuddy, Senior Counsel, F.D.I.C., Washington, DC; Steven A. Hammond, Merrikay S. Hall, and Kevin M. Crotty, Hughes, Hubbard & Reed, New York City, of counsel), for defendant-appellee F.D.I.C.
 O. Peter Sherwood, Corp. Counsel of the City of New York, Attorney for the City of New York, New York City (Edward F.X. Hart, Frances J. Henn, and Stanley Buchsbaum, Corp. Counsel of the City of New York, of counsel), filed a brief for amicus curiae the City of New York.
 Before: TIMBERS,* CARDAMONE and WINTER, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 The question we are called upon to resolve is whether Seamen's Bank (Seamen's), a federal savings bank chartered under the Home Owners' Loan Act of 1933, must pay New York State's bank franchise tax during a time when it was receiving financial assistance from the Federal Deposit Insurance Corporation (FDIC). Seamen's Bank, with its principal office at 30 Wall Street, New York City, was originally founded, as its name suggests, to serve people and businesses engaged in the seafaring trade. It is one of the oldest banks in the United States, having been chartered in New York in 1829. Subsequently it became a federally chartered savings bank. To aid banks like Seamen's that, within the past decade, were veering towards the shoals of financial insolvency, Congress enacted a law authorizing the FDIC to throw them a lifeline. In the case before us, with Seamen's at the time somewhat stabilized by the FDIC's lifeline, but still in danger of foundering, the State of New York urges a construction of the law enacted to save banks that would effectively cast off the FDIC's lifeline to Seamen's, and let the bank drift again towards financial disaster.
 
 
 2
 Plaintiffs James Wetzler, New York State's Commissioner of Taxation and Finance, and the New York State Department of Taxation and Finance (State) appeal from a judgment entered on September 10, 1993 by the United States District Court for the Southern District of New York (McKenna, J.) granting defendant Federal Deposit Insurance Corporation's motion for summary judgment and denying the State's cross-motion for summary judgment, and dismissing its action. We turn to examine the statutes at issue, the facts, and the proceedings in the district court.
 
 BACKGROUND
 Statutory Scheme
 
 3
 Because this case involves a tax dispute covering the years 1982-1984, the federal and New York state statutes that were in effect during those years are frequently cited, even though both statutes have since been repealed. The controversy before us stems from the enactment on October 15, 1982 of the Garn-St. Germain Depository Institutions Act of 1982, Pub L. No. 97-320, Sec. 202, 96 Stat. 1469, 1489 (codified as amended at 12 U.S.C. Sec. 1823(i) (1988 & Supp. II 1990)) (repealed by Pub.L. No. 97-320, Sec. 206, 96 Stat. 1496 (1982), as amended by Pub.L. No. 100-86, Sec. 509(b), 101 Stat. 635 (1987), and Pub.L. No. 101-73, Sec. 217(7), 103 Stat. 258 (1989)) (Garn Act). The Garn Act was Congress' response to the financial plight of the nation's savings banks in the early 1980s, many of which were losing money because so many of their loans were in long-term residential mortgages that carried low interest rates. See S.Rep. No. 536, 97th Cong., 2d Sess. 1, 2, reprinted in 1982 U.S.C.C.A.N. 3054, 3055, 3056; S.Conf.Rep. No. 641, 97th Cong., 2d Sess. 85-86, reprinted in 1982 U.S.C.C.A.N. 3054, 3128-29.
 
 
 4
 A cornerstone of the Garn Act was Congress' decision to authorize the FDIC to purchase capital instruments from qualified banks, to be known as "net worth certificates," which the banks would issue. See 12 U.S.C. Sec. 1823(i)(1)(A). In exchange for such a certificate, the FDIC would give the bank a promissory note. The issued certificates became part of the bank's capital account and, as such, increased the bank's net worth; hence, the name given these instruments. The bank could pay dividends on the certificates at a rate equal to the interest on the promissory notes given it by the FDIC. See id. Sec. 1823(i)(1)(B). "Although such a transaction could be viewed as purely a paper one, Congress believed that the exchange would 'partially offset [participating banks'] current losses and shore up the net worth of qualified institutions.'... In other words, by issuing promissory notes to the banks, the FDIC would, in effect, be guaranteeing some of the banks' assets." FDIC v. New York, 928 F.2d 56, 57 (2d Cir.1991) (quoting S.Rep. No. 536 at 10, reprinted in 1982 U.S.C.C.A.N. at 3063).
 
 
 5
 In order to be a qualified institution within the meaning of the Garn Act, a depository institution must, inter alia, have (1) had a net worth equal to or less than three percent of its assets, (2) incurred losses for two quarters prior to receiving assistance, and (3) maintained investments in residential mortgages or mortgage-backed securities aggregating at least 20 percent of its loan portfolio. See 12 U.S.C. Sec. 1823(i)(2)(A), (B) and (F).
 
 
 6
 Coupled with the net worth certificate program, Congress included a series of measures to ensure that the assistance would have some substance. One of those measures, enacted at 12 U.S.C. Sec. 1823(i)(9), was aimed at alleviating ailing institutions' burden of paying state and local taxes. It provides:
 
 
 7
 During any period when a qualified institution has outstanding net worth certificates issued in accordance with this subsection, such institution shall not be liable for any State or local tax which is determined on the basis of the deposits held by such institution or the interest or dividends paid on such deposits.
 
 
 8
 12 U.S.C. Sec. 1823(i)(9) (1988) (emphasis added). The construction to be given to the just cited section is the subject of this appeal.
 
 
 9
 The tax sought to be collected from Seamen's Bank is the New York Franchise Tax on Banking Corporations, Article 32, N.Y. Tax Law, Secs. 1450-1468 (McKinney 1975 & Supp.1994) (Bank Franchise Tax). Section 1451 imposed a tax on every bank exercising its franchise or doing business within New York. For the relevant years the tax was measured by the bank's entire net income or the portion of its net income allocated to New York. See id. Sec. 1455(a). When a savings bank or savings and loan association had no net income, the State imposed the greater of two alternative taxes: a nominal tax of $250 or a deposit-based tax that depended on the amount of interest or dividends credited to the banks' depositors within the period. See id. Sec. 1455(b).
 
 Facts
 
 10
 Having set forth the statutory context, we pass to the underlying facts, which the parties have stipulated. Seamen's Bank was a qualified institution within the meaning of the Garn Act for a portion of the last quarter of 1982, the first, second and third quarters of 1983, and the second quarter of 1984. Accordingly, it issued net worth certificates on several occasions, the first time being December 29, 1982, and it had certificates outstanding from that date through the end of 1984.
 
 
 11
 During this period the bank and the State wrestled over the question of the bank's tax liability under the state's Bank Franchise Tax in light of the Garn Act, and in particular the tax exemption created by Sec. 1823(i)(9). For the taxable period that ended December 31, 1982 Seamen's franchise tax return asserted that all the interest credited to customers during 1982 was exempt from the state franchise tax pursuant to Sec. 1823(i)(9), not just the amount credited to depositors during the last three days of 1982, when Seamen's first held outstanding certificates. Seamen's therefore computed its tax due at the $250 minimum--which was not exempt under the Garn Act--less claimed credits of $51,471, reducing the tax due to zero.
 
 
 12
 Taking exception to the bank's reliance on Sec. 1823(i)(9), the State issued a Statement of Audit Adjustment and Notice of Deficiency with respect to the taxable year 1982. The State's figures showed that Seamen's had an estimated total tax deficiency for 1982 of $637,225, plus $198,673.80 in interest on that amount as of July 26, 1985, for a total due and owing the State of New York of $835,898.80.
 
 
 13
 A similar pattern of events unfolded for the next two years. On its tax return for the taxable period ending December 31, 1983, the bank again computed its tax at the minimum $250 figure. The State responded with a similar adjustment and notice setting forth an estimated total deficiency for 1983 of $1,167,116.47 ($815,000 in tax and $352,116.47 in interest), as of September 14, 1987. This deficiency was later reduced by the State, first to $201,438.51, and then to $178,638.51. In March 1990 the State applied a refund due Seamen's for the taxable year that ended December 31, 1988. This reduced Seamen's tax liability to zero, while penalties were reduced to approximately $3,000, and outstanding interest remained unchanged. The same scenario occurred for the taxable period ending December 31, 1984. For the 1984 taxable year the State estimated a total deficiency of $1,324,745.93, as of September 6, 1990, reflecting $775,000 in taxes and $549,745.93 in interest.
 
 
 14
 On April 17, 1990 the FDIC was appointed as Receiver of Seamen's Bank. The bank was declared insolvent the next day and closed its doors. The State filed a claim with the FDIC--as required by the FDIC's receivership claims procedure, see 12 U.S.C. Sec. 1821(d)(3)-(5) (Supp. IV 1992)--for the taxes, penalties, and interest it contends Seamen's owed it for the taxable years 1982 through 1984. The claimed amount was $2,728,924.83 ($1,410,375.52 in taxes and $1,318,567.31 in interest). The breakdown for the individual years is as follows: $1,309,152.96, for the taxable year that ended December 31, 1982 ($635,375.52 taxes and $673,777.44 interest); $150,147.42 for the taxable year that ended December 31, 1983 (zero taxes and $150,147.42 penalties and interest); and $1,269,642.45 for the taxable year that ended December 31, 1984 ($775,000 taxes and $494,642.45 interest).
 
 
 15
 Relying on its interpretation of Sec. 1823(i)(9), the FDIC rejected the State's claims. The federal agency maintains that when an institution has outstanding certificates the word "period" must be construed under Sec. 1823(i)(9) to mean the entire relevant taxable period. It avers that in this case the calendar year is the relevant taxable period. Thus, the FDIC believes that Seamen's was exempt from all state taxes incurred at any time in 1982, 1983, or 1984 because it had certificates outstanding from December 29, 1982 through December 31, 1982, and throughout the entire years of 1983 and 1984.
 
 
 16
 The State urges, to the contrary, that the word "period" must be modified by the language that follows it in Sec. 1823(i)(9), which states "when a qualified institution has outstanding net worth certificates." Hence, the State insists Seamen's was only exempt on those days when it was both (1) qualified (as defined by the statute), and (2) actually had outstanding certificates. Under the State's construction of Sec. 1823(i)(9), the bank would only be exempt from December 29, 1982 through December 31, 1982, and for the first, second and third quarters of 1983 and the second quarter of 1984; that is, for those quarters in 1983 and 1984 when Seamen's not only had outstanding certificates, but was also qualified to issue new ones.
 
 Proceedings in the District Court
 
 17
 In June 1992 the State brought the present action in the Southern District of New York seeking a declaratory judgment that would adopt its view of the federal statute, and direct payment to it of the alleged $2.7 million deficiency. Both parties moved for summary judgment relying on their different readings of Sec. 1823(i)(9).
 
 
 18
 In a published opinion Judge McKenna ruled in favor of the FDIC. See Wetzler v. FDIC, 814 F.Supp. 351 (S.D.N.Y.1993). The district court concluded that the word "period" was ambiguous and that "the FDIC's interpretation is consonant with the overall statutory purpose of the Garn Act and effects a result compatible with its legislative history." Id. at 353. This appeal followed. New York City--which imposes a tax essentially identical to Sec. 1451 of the State's Franchise Tax law--has filed an amicus brief in support of the State's position.
 
 DISCUSSION
 
 19
 * The first issue to be addressed is whether Sec. 1823(i)(9)'s exemption from state and local taxes for banks with net worth certificates applies to an entire tax year during which the bank had certificates outstanding (in this case the calendar year); or whether the exemption covers only those days of the taxable year when such certificates were actually outstanding. Because no facts are in dispute and the district court ruled on the parties' summary judgment motions as a matter of law, we review its legal determinations de novo. See, e.g., Greene v. United States, 13 F.3d 577, 580 (2d Cir.1994). Believing the statute to be ambiguous--apparently because the parties had proffered different interpretations of it--the district court examined the Garn Act's legislative history and concluded that "period" should correspond to the taxable period. See Wetzler, 814 F.Supp. at 354.
 
 
 20
 In ascertaining what the words in a statute mean, we start with the familiar maxim that one must look first to the words Congress used because "a court should presume that the statute says what it means." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.1993). When the words selected by Congress to be included in a statute are clear and unambiguous, judicial inquiry ends. See Connecticut National Bank v. Germain, --- U.S. ----, ----, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). At that point, a court's sole function is to give effect to the statute according to its terms. See United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).
 
 
 21
 Section 1823(i)(9) provides an exemption from the State Bank Franchise Tax "[d]uring any period when a qualified institution has outstanding net worth certificates." Both the district court and the FDIC believe the word "period" is ambiguous because they think it arguably could refer to the taxable period dictated by the particular state tax that the banking institution is exempted from paying. Congress of course did not modify "period" by the word "taxable." Instead, the statute simply states that the exemption from state taxes applies for the time when a qualified bank has certificates "outstanding." To broaden this temporal duration beyond what the statute provides by inserting the word "taxable" stretches and, in our view, distorts the statute's plain language.
 
 
 22
 Moreover, such a reading contradicts two fundamental principles of statutory construction. First, for over a century it has been part of the Supreme Court's teaching that since tax exemptions are in derogation of a state's sovereign authority, they are "not to be extended beyond the exact and express requirements of the language used, [and are to be] construed strictissimi juris. " Yazoo & M.V. R.R. v. Thomas, 132 U.S. 174, 185, 10 S.Ct. 68, 72, 33 L.Ed. 302 (1889). See Rockford Life Ins. Co. v. Illinois Dep't of Revenue, 482 U.S. 182, 191, 107 S.Ct. 2312, 2317, 96 L.Ed.2d 152 (1987) ("A court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly established."). Here, by expanding the exemption beyond the express terms of the statute, the district court effectively excused Seamen's from paying the state's franchise tax for the entire calendar year 1982, even though Seamen's had outstanding net worth certificates for only the last three days of that year.
 
 
 23
 Second, we have frequently held "[t]here is a strong presumption against the retrospective application of a statute." United States v. Alcan Aluminum Corp., 990 F.2d 711, 724 (2d Cir.1993). See Butts v. City of New York Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1409 (2d Cir.1993). The Supreme Court has recently emphasized the continued vitality of the notion that statutes look to the future and that the presumption against retroactivity accords with legislative and public expectations of how statutes work. See Landgraf v. USI Film Prods., --- U.S. ----, ----, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994). Under the district court's reading of Sec. 1823(i)(9), the statute necessarily is applied retrospectively. The Garn Act was passed in October 1982. Allowing Seamen's an exemption from the Bank Franchise Tax for all of 1982 permits the bank to escape a tax it incurred prior to the Garn Act's enactment. Ruling in that fashion effectively nullifies the state franchise tax, transgressing the rule that "[n]o law ... should be construed retrospectively unless Congress' purpose can be satisfied in no other way or unless the statutory language admits of no other meaning." Alcan Aluminum Corp., 990 F.2d at 724. Neither criterion for retrospective application of the Garn Act is present in this case.
 
 
 24
 Remembering that this is an attempt to ascertain Congress' purpose, we cannot fail to observe that our reading of Sec. 1823(i)(9) is supported by the Garn Act's legislative history. The Senate Banking, Housing, and Urban Affairs Committee wrote that institutions were exempted "from state and local franchise taxes so long as they have [certificates] outstanding." S.Rep. No. 536 at 10, reprinted in 1982 U.S.C.C.A.N. at 3064. Later, in the technical explanation of the statute, the same committee described the provision: "As long as a qualified institution has [certificates] outstanding, it will not be liable for any State or local franchise tax." Id. at 52, reprinted in 1982 U.S.C.C.A.N. at 3106. On neither of these two occasions did the committee suggest that the exemption could encompass a time frame broader than that in which a certificate was outstanding.
 
 
 25
 This view is also consistent with other uses of the word "period" in the Garn Act. For example, Sec. 1823(i)(13) prohibits an institution from paying dividends to its shareholders "[d]uring any period in which ... [the] institution ... has outstanding certificates." 12 U.S.C. Sec. 1823(i)(13). It would be anomalous indeed to construe this provision as prohibiting an institution--which began a taxable year with outstanding certificates--from later paying dividends when it no longer has any such certificates outstanding. Hence, to adopt the FDIC's proposed reading of Sec. 1823(i)(9) would violate the " 'normal rule of statutory construction,' ... that 'identical words used in different parts of the same act are intended to have the same meaning.' " Commissioner v. Keystone Consol. Indus., Inc., --- U.S. ----, ----, 113 S.Ct. 2006, 2011, 124 L.Ed.2d 71 (1993).
 
 
 26
 We suppose the one hurdle the district court could not easily get over was its apparent belief that because the Bank Franchise Tax was imposed on Seamen's for its taxable period--the calendar year--the tax was not divisible, that is to say, it could not be divided between the time periods when certificates were and were not outstanding. Yet the state tax law itself provides that the tax is imposed on banks "for each of its taxable years, or any part thereof." N.Y. Tax Law Sec. 1451(a). The district court disregarded the "any part thereof" language, under the mistaken belief that the tax could only be calculated at the close of the calendar year.
 
 
 27
 Because the state tax law provides for the divisibility of taxable years, we think it reasonably clear that the bank's tax may be calculated solely for those periods when the bank had outstanding certificates. Seamen's was subject either to the alternative minimum tax or the flat tax. The alternative minimum tax can easily be calculated on a day-to-day basis because it directly corresponds to the interest or dividends credited to depositors. In calculating the tax, the State could properly exclude the interest credited on the final three days of 1982. The net income tax--concededly calculated based on yearly earnings--did not come into play because Seamen's was not a profitable enterprise. Even had such tax applied, a proportional offset could be made for the number of days when the bank had outstanding certificates. Thus, it follows that the district court's contrary position on the meaning of the word "period" may not stand.
 
 II
 
 28
 The remaining issue to be addressed is whether Seamen's, in those years that it had outstanding certificates for the entire taxable year, must nonetheless pay the Bank Franchise Tax for those quarters in which it was no longer "qualified," i.e., would not have been able to issue new net worth certificates because it had not suffered losses in the preceding two quarters. The State again urges that we look only to the plain language of Sec. 1823(i)(9) to conclude that Seamen's must pay the franchise tax for those quarters in which it is no longer "qualified." In other words, the State believes Seamen's owes a tax for the fourth quarter of 1983 and the first, third and fourth quarters of 1984 because it did not incur losses in the two quarters directly preceding each of the aforementioned quarters, even though it had certificates outstanding for all of them.
 
 
 29
 In contrast to the earlier discussion on the legislature's use of the word "period" in Sec. 1823(i)(9), which we think clear and unambiguous, the word "qualified" in the same section of the statute is not quite so plain. The section, as noted, provides an exemption from taxes "[d]uring any period when a qualified institution has outstanding net worth certificates." Congress could have meant "qualified" to indicate that the outstanding certificates must issue from an institution previously qualified to issue them, or it could have intended that a bank had to be qualified for the precise period in which it sought the exemption. Either reading is equally plausible.
 
 
 30
 Given this potential ambiguity, the legislative history of the Garn Act may properly be examined. See Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation, 17 F.3d 521, 531 (2d Cir.1994) ("where ambiguity resides in a statute, legislative history and other tools of interpretation may be employed to determine legislative purpose more perfectly"). Since the term "qualified institution" is not discussed in that history, the only tool available in construing Sec. 1823(i)(9) is to give it an interpretation that best serves Congress' overall goal when it passed the Garn Act. That purpose was "to assist financially troubled commercial banking institutions." FDIC v. New York, 928 F.2d at 57. Subjecting a bank that has lost money and has issued net worth certificates to a state franchise tax liability would defeat Congress' aim of shoring up the bank's finances.
 
 
 31
 In creating the Garn Act, Congress, as the earlier discussion relates, was dealing with a sick segment of the banking industry, whose outflow of cash exceeded its inflow. To staunch this hemorrhaging Congress authorized the FDIC to give "qualified" banks transfusions of cash. When the transfusion has been initially successful, as here, it would fly in the face of the legislative scheme to permit an increase in the bank's cash outflow by interpreting the Garn Act in a way that would allow federal assistance payments to flow through the bank into the State's coffers.
 
 
 32
 This conclusion remains true despite the fact that as a result of the FDIC's money transfusion the bank had regained sufficient financial health so as to be no longer qualified to issue certificates. Hence, we hold that a depository institution that previously qualified to issue certificates is exempt from state or local deposit-based taxes during any period it has outstanding certificates. In the case at hand, that means Seamen's Bank was exempt from the state's Bank Franchise Tax for all of 1983 and 1984.
 
 CONCLUSION
 
 33
 In sum, the order of the district court must be reversed in part. This result nevertheless constitutes but a partial victory for the State, since although the exemption applied only for the actual days Seamen's had an outstanding certificate, that exemption did not lapse when Seamen's had outstanding certificates, but was no longer qualified to issue new ones. Accordingly, the FDIC owes the State the Bank Franchise Tax for the year 1982, plus interest, except for that portion related to interest or dividends credited to customers' accounts from December 29, 1982 through December 31, 1982. The FDIC owes the State no franchise taxes for the calendar years 1983 and 1984.
 
 
 34
 Accordingly, the judgment appealed from is affirmed, in part, and reversed, in part.
 
 
 
 *
 Since the oral argument of this case and after it was submitted for decision, Senior Judge William H. Timbers recused himself from all his pending cases. The two remaining judges have proceeded to decide this case pursuant to the provisions of Sec. 0.14(b) of the Rules of this Court