**Denise KATZMAN, et al., Plaintiffs,**

v.

**VICTORIA'S SECRET CATALOGUE, et al., Defendants.**

**In re COURTROOM TELEVISION NETWORK, Applicant/Proposed Intervenor.**

**No. 96 Civ. 0003 (RWS).**

United States District Court, S.D. New York.

April 29, 1996.

---

Howard Gotbetter, New York City, for Plaintiffs.

Parker Chapin Flattau & Klimpl, L.L.P., New York City (Stephen F. Harmon, of counsel), for Defendants.

Fried, Frank, Harris, Shriver & Jacobson, New York City (Gregory P. Joseph, of counsel), for Defendants.

Cahill Gordon & Reindel, New York City (Floyd Abrams, of counsel), for Proposed Intervenor.

SWEET, District Judge.

Courtroom Television Network ("Court TV") has moved to be heard, either pursuant to General Local Rule 7 of this Court ("Rule 7") or through a motion to intervene pursuant to Rule 24, Fed.R.Civ.P., to seek permission to televise an oral argument to be held on May 1, 1996, on the motion of Defendants, Victoria's Secret Catalogue, Leslie H. Wexner, Edward G. Razek, Cynthia Fedus, and Betsy Hendrickson (collectively, "Victoria's Secret" or "Defendants"), to dismiss the Amended Complaint and on the motion of Plaintiff Denise Katzman ("Katzman") to amend the Amended Complaint (the "May 1 Argument"). For the reasons set forth below, Court TV's motions to intervene and to televise the May 1 Argument will be granted.

## Background

### Prior Proceedings

The Complaint was filed on January 2, 1996, as a class action, and an Amended Complaint was filed on January 4, 1996. The filings were reported in a number of news publications and on television.

The Amended Complaint alleges that Victoria's Secret Catalogue, a manufacturer and distributor of women's apparel, which sells large volumes of merchandise via mail order catalogue, has discriminated in its pricing structures with respect to catalogues mailed to different catalogue recipients. The Amended Complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"). A proposed second amended and supplemental complaint alleges violations of the Lanham Act, adds an additional named plaintiff, and provides additional detail on the alleged discriminatory scheme. Two pretrial motions are pending: Defendants' motion to dismiss the Amended Complaint, which challenges the legal sufficiency of the discriminatory pricing claims, and Katzman's motion to serve and file the second amended and supplemental complaint. The motions are scheduled to be heard on May 1, 1996.

### The Nature of the Application

The instant application to be heard and to televise the May 1 Argument was heard on its return date, April 17, 1996, and was opposed by Defendants. It was considered fully submitted on that date.

Court TV is a news television network, which reports on legal and judicial systems within the United States and abroad. Since its creation, Court TV has specialized in extended, complete coverage of civil and criminal trials and has televised over four hundred such trials, as well as numerous oral arguments, both on motions before trial courts and in appellate proceedings. Court TV has televised fifty-one cases in federal court, both before district courts (including this Court) and courts of appeals.

Court TV uses one small, stationary camera, which makes no noise and requires only existing courtroom lighting. The camera is placed away from the proceedings and can be operated by remote control by a Court TV technician. Small microphones record only the public record. The equipment is no more distracting in appearance than reporters with notebooks or artists with sketch pads.

Court TV seeks to televise the May 1 Argument gavel-to-gavel. Court TV will not

state whether it will carry the May 1 Argument live or when or if it will be broadcast.

### Discussion

#### The Motion to Intervene Will be Granted

 Generally, "representatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion.'" *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 609 n. 24, 102 S.Ct. 2613, 2621 n. 24, 73 L.Ed.2d 248 (1982) (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 401, 99 S.Ct. 2898, 2916, 61 L.Ed.2d 608 (1979) (Powell, J., concurring)). Rule 24(a)(2) of the Federal Rules of Civil Procedure provides that intervention shall be granted as of right when an applicant:

> claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Court TV has articulated an interest relating to this action: its interest in broadcasting to its viewers an event it deems newsworthy—the May 1 Argument.

With respect to the second criterion of Rule 24(a)(2), neither Katzman nor Defendants adequately represent the interest of Court TV. Defendants have vigorously opposed Court TV's motion and, thus, plainly do not represent Court TV's interests. Katzman supports the application but possesses an entirely different interest. Important interests are best championed by those most directly affected by their impairment. *See, e.g., In re NASDAQ Market–Makers Antitrust Litig.*, 164 F.R.D. 346, 351 (S.D.N.Y. 1996) (granting newspaper's motion to intervene to be heard on issue of access to sealed court materials); *In re Akron Beacon Journal*, 1995 WL 234710, at *2–5 (S.D.N.Y. Apr. 20, 1995) (granting newspaper's motion to

intervene to seek modification of protective order); *United States v. Yonkers Bd. of Educ.*, 587 F.Supp. 51, 52 (S.D.N.Y.) (granting reporter's motion to intervene to seek to tape court proceedings), *aff'd*, 747 F.2d 111 (2d Cir.1984). Accordingly, Court TV meets the second criterion for intervention, and its motion to intervene pursuant to Rule 24 will be granted.

#### Local Rule 7 is Controlling

 Rule 7, entitled "Photographs, Radio, Recordings, Television," reads, in pertinent part, as follows:

> No one other than court officials engaged in the conduct of court business shall bring any camera, transmitter, receiver, portable telephone or recording device into any courthouse or its environs without written permission of a judge of that court.

S.D.N.Y.Gen.R. 7.

 This rule was promulgated by the Board of Judges of this District as a result of Congress' determination that "all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business." 28 U.S.C. § 2071(a) (1988). Pursuant to that statute, the Federal Rules of Civil Procedure provide:

> Each district court, acting by a majority of its district judges, may, after giving appropriate public notice and an opportunity for comment, make and amend rules governing its practice.... A local rule takes effect on the date specified by the district court and remains in effect unless amended by the court or abrogated by the judicial council of the circuit.

Rule 83(a)(1). Fed.R.Civ.P. Rule 7, which was enacted by a majority of this Court's judges, took effect on June 30, 1988, *see Marisol A. v. Giuliani*, 95 Civ. 10533 (RJW), 1996 WL 91638 at *1 (S.D.N.Y. Mar. 1, 1996), and is the only local rule at present that addresses the topic of television, cameras, and related matters.[1]

---

1. Rule 53, Fed.R.Crim.P., bans broadcasts from the courtroom, but the Federal Rules of Civil Procedure are silent on this topic. The fact that Rule 7 cannot apply in criminal cases in the face

of Rule 53 does not invalidate its application in civil proceedings.

Canon 3(A)(7) of the Code of Judicial Conduct for the United States Judges, promulgated by the Judicial Conference, formerly provided that a

On September 20, 1994, the Judicial Conference of the United States "declined to approve" the recommendation of its Committee on Court Administration and Case Management to permit generally the "photographing, recording, and broadcasting of civil proceedings in federal trial and appellate courts." That decision followed a two-year-long "Pilot Program" on television in federal trial courts, in which this Court participated.

On March 12, 1996, the Judicial Conference resolved that "each Court of Appeals may decide for itself whether to permit the taking of photographs and radio and television coverage of appellate arguments." At the same time, the Judicial Conference approved a resolution "strongly urging each judicial council to adopt pursuant to 28 U.S.C. § 332(d)(1) an order reflecting the Conference's September 1994 decision not to permit the taking of photographs and radio and television coverage of proceedings in U.S. district courts." In addition, "the Conference also voted to strongly urge circuit judicial councils to abrogate any local rules of court that conflict with this decision, pursuant to 28 U.S.C. § 2071(c)(1)."

■ However, Section 331 of the Judicial Code, which established the Conference, excludes from its authority the changing or overruling of district court rules. This Court evaluated the authority of the Judicial Conference in its recent decision in *Marisol A.*, 1996 WL 91638, at *1. There, the Honorable Robert J. Ward ruled that "the policy of the Conference does not overrule or supplant the Local Rules adopted by the Board of Judges of this District Court." *See* 28 U.S.C. §§ 331, 2071(c) (1988). *Marisol A.*, 1996 WL 91638, at *1. Judge Ward held, "the Court should consider the Conference policy only as a persuasive factor in the exercise" of its discretionary powers under Rule 7. *Id.; accord United States v. Cacciatore*, 487 F.2d 240, 243 n. 2 (2d Cir.1973) (rejecting reliance on Judicial Conference report that provided shorter time period for disposing of criminal cases than did the rules of this Court, noting: "[w]hatever the merits of this recommenda-

tion of the Judicial Conference, the fact remains that it has never been implemented by the District Court for the Southern District of New York by rule or otherwise....").

There is, then, no binding authority other than Local General Rule 7 that addresses the topic of television. While the recent action of the Judicial Conference is persuasive, this Court is not required to defer to it. *See Marisol A.*, 1996 WL 91638, at *1.

### Rule 7 Provides Discretion to Grant the Relief Requested

■ Although Rule 7 does not state in the affirmative that court proceedings may be televised, it plainly permits cameras in the courtroom with a judge's written permission. "Television", though not mentioned in the text of the rule, appears in its title. Indeed, the title of a statutory provision can easily resolve "any possible ambiguity" in interpreting the meaning of that provision. *Mead Corp. v. Tilley*, 490 U.S. 714, 723, 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796 (1989); *accord F.T.C. v. Mandel Bros., Inc.*, 359 U.S. 385, 388–89, 79 S.Ct. 818, 822, 3 L.Ed.2d 893 (1959). On its face, then, Rule 7, as Judge Ward found in *Marisol A.*, 1996 WL 91638, at *1, grants a judge of this Court discretion to authorize television of proceedings in his or her courtroom.

■ In the face of plain language such as that in Rule 7, a venture into a rule or statute's etiology for the purposes of finding another less permissive and discretionary meaning is generally inappropriate. As our Court of Appeals has noted:

[T]he first canon of statutory construction is that "a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, [503 U.S. 249, 253] 112 S.Ct. 1146, 1149 [117 L.Ed.2d 391] (collecting cases). Indeed, "[w]hen the words of a statute are unambiguous, ... this first canon is also the last: 'Judicial inquiry is complete.' *Id.* (quoting *Rubin v. United States*, 449 U.S. 424, 430 [101 S.Ct. 698, 701, 66 L.Ed.2d 633] (1981)). Finally, "un-

---

judge should prohibit televising of court proceedings except for the presentation of evidence, for the perpetuation or a record, or in the case of

investitive, ceremonial, or naturalization proceedings. That rule was removed from the Canon, however, in 1988.

less otherwise defined, [statutory] words will be interpreted as taking their ordinary, contemporary, common meaning."

*United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 259, 130 L.Ed.2d 179 (1994); *accord, e.g., Wetzler v. FDIC*, 38 F.3d 69, 73 (2d Cir.1994).[2] The same rules of construction apply particularly to rules promulgated by the court itself pursuant to congressional authority, such as Rule 7.

The carefully constructed legislative history argument of Victoria's Secret to bestow another meaning on Rule 7 is, in any event, ultimately no more solid than the plain language interpretation. The former Rule 7, McKinney's *New York Rules of Court*, S.D.N.Y. Gen.R. 7 (West 1988) ("Former Rule 7") read as follows:

> The taking of photographs and the use of recording devices in the courtroom of its environs, except by officials of the court in the conduct of the court's business, or radio or television broadcasting from the courtroom or its environs, during the progress of or in connection with judicial proceedings, including proceedings before a United States Magistrate, whether or not the court is actually in session, is prohibited.

It is argued that the added reference to a "transmitter, receiver [or] portable telephone" and the omission of any reference to "radio", "television", "broadcasting", or "judicial proceedings" suggest that Rule 7 was adopted to address security concerns about the presence and use of electronic devices in the Courthouse and to bring within the prohibitory ambit of Rule 7 technology not already mentioned.

However, clear wording of a blanket prohibition in Former Rule 7 was abandoned in the formulation of the current rule. In fact, Former Rule 7 was changed to grant judges discretion to permit the use of such technology in their courtrooms.

By order dated May 16, 1991, the Southern District Board of Judges adopted guidelines, stating in relevant part:

> At its meeting of May 2, 1991, the Board of Judges of the Southern District of New York adopted guidelines for a pilot program, known as "Cameras in the Courtroom," which would allow the limited use of certain recording and transmitting devices in the Courtroom. This subject is covered by Joint Local General Rule 7 which generally prohibits the use of such equipment.
>
> ORDERED that effective July 1, 1991, the Guidelines for Cameras in the Courtroom adopted May 2, 1991 shall preempt Local General Rule 7 but only to the extent inconsistent therewith.

Defendants argue that this language clearly demonstrates that Rule 7 prohibits televising proceedings. Yet the adoption of court-wide guidelines can instead be seen as nothing more than a measure to ensure consistent and, thus, meaningful results from the Pilot Program, which was, in essence, a study.

In sum, the plain language of Rule 7 vests discretion to permit televised proceedings in each individual judge of this Court, and reference to the context of its revision is thus unnecessary. Even if the history is considered, the questions raised fail to present convincing evidence that Rule 7 was meant to continue the blanket prohibition against televised proceedings contained in Former Rule 7.

### Discretion Will Be Exercised to Grant the First Amendment Requested Relief

During the last thirty years, studies conducted by state and federal jurisdictions to evaluate the effect on the judicial process of the presence of cameras in courtrooms have demonstrated that televised coverage of trial court proceedings does not impede the fair administration of justice, does not compromise the dignity of the court, and does not impair the orderly conduct of proceedings.

---

2. *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) did not stand for the proposition, as Victoria's Secret contends, that in determining the meaning of a statute, a court should consider "all available evidence." *Id.* at 177–78, 113 S.Ct. at 2562.

The Court in *Sale* noted that it had sought its conclusion from "all available evidence" in the course of construing a highly ambiguous statute. *Id.* It did not reach any holdings regarding statutory construction, and it did not confront an unambiguous statute like the rule at hand.

Increased media access to and knowledge of the workings of the judiciary have compelled a sea change from the middle of this century, when nearly every state, as well as the federal criminal courts, barred any in-court audio-visual coverage. Beginning in the 1970's and 1980's, rapid advances in technology and the incorporation of television into America's daily information diet convinced states to begin to experiment with cameras in the courtroom and to study their effects on the proceedings. Led by Florida, and with the subsequent imprimatur of the United States Supreme Court, *see Chandler v. Florida*, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981), forty-seven states, according to Court TV, have permitted television in their courtrooms with proper procedural protections for all participants, first on an experimental basis and then on a permanent one.

The results of studies of these experiments, conducted between 1979 and 1994, establish that a silent, unobtrusive in-court camera can increase public access to the courtroom without interfering with the fair administration of justice. New York, for instance, has conducted three different studies evaluating successive experiments. In each case cameras not only were determined not to have impaired the conduct of fairness of any proceeding, but were determined to have enhanced public education. The most recent of these evaluations reported, among other things, that because "[r]elatively few people ever attend court proceedings ... [t]elevision coverage ... exposes greater numbers of citizens to our justice system," Report of the Committee on Audio–Visual Coverage of Court Proceedings at 86, televised coverage of proceedings "engenders a deeper understanding of legal principles and processes," *id.*, cameras have enabled the public, to greater effect than previously possible, to monitor whether "justice is handed out fairly and impartially," *id.* at 90, and "reporting on court proceedings, both by newspaper and broadcast reporters, frequently is more accurate and comprehensive when cameras are present." *Id.* at 91. The New York study was in accord with the many that had preceded it determining that technology made it possible for cameras to enter courtrooms without disturbing proceedings, that wit-nesses, jurors and attorneys remained unaffected, *id.* at 93, and that cameras ensured greater fairness toward parties by judges. *Id.* at 91–93.

As noted above, the Judicial Conference Pilot Program, in effect from January 1, 1993, through December 31, 1994, suggested similar results. The study of the Pilot Program produced by the Federal Judicial Center (the "Federal Study") revealed an overwhelmingly positive impact as a result of the presence of cameras. Electronic Media Coverage of Federal Civil Proceedings, Federal Judicial Center, 1994 ("Federal Report"). Based on a review of numerous prior state studies, judge and attorney evaluations submitted in connection with the Pilot Program, and interviews with participants, the Federal Study concluded, among other things:

1) Overall, attitudes of judges toward electronic media coverage of civil proceedings were initially neutral and became more favorable after experience under the pilot program. Federal Report at 7.

2) Judges and attorneys who had experience with electronic media coverage under the program generally reported observing small or no effects of camera presence on participants in the proceedings, courtroom decorum, or the administration of justice. *Id.*

3) Judges, media representatives, and court staff found the guidelines governing the program to be generally "workable" and "judges and court staff" report[ed] that members of the media were very cooperative and complied with the program guidelines and any other restrictions imposed. *Id.*

Based upon these findings, the Case Management Committee charged with overseeing the Pilot Program submitted to the Judicial Conference a report and recommendation that camera coverage of civil proceedings, both trial and appellate, be made permanent and be extended to all federal courts.

The concerns raised by Defendants are countered by these studies and by the circumstances of the matter at bar. No witnesses or jurors will be present at the May 1

Argument, *see Marisol A.,* 1996 WL 91638, at *2, and the proceeding cannot be distinguished from an appellate oral argument, which may now be televised in our Court of Appeals and in the Ninth Circuit.

Fears of attorney grandstanding and that the court's dignity will be compromised in the context of an oral argument are unfounded. A comparison to the recent trial of O.J. Simpson is unwarranted. On this topic, the Supreme Court's admonition in *Bridges v. California,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941), is more than instructive:

> The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

314 U.S. at 270–71, 62 S.Ct. at 197–98.

Concern has also been expressed arising from editorialization and the selective use of "soundbites" from the footage of courtroom broadcasts. Here, the May 1 Argument will be televised gavel-to-gavel on Court TV. But even if it were not to be, as the Florida Supreme Court has stated, "newsworthy trials are newsworthy trials, and ... they will be extensively covered by the media both within and without the courtroom whether [cameras are permitted] or not." *In re Petition of Post–Newsweek Stations,* 370 So.2d 764, 776 (Fla.1979). Even small portions of televised coverage can add to the informational value of a reporter's summary of events. Report of the Committee on Audio–Visual Coverage of Court Proceedings, at 91 ("[R]eporting on court proceedings, both by newspaper and broadcast reporters, frequently is more accurate and comprehensive when cameras are present."). More fundamentally, however, courts cannot control editorial judgments by journalists, whether electronic or print, for to do so would be plainly at odds with the First Amendment. *See Craig v. Harney,* 331 U.S. 367, 375, 67 S.Ct.

1249, 1254, 91 L.Ed. 1546 (1947) (reporter could not constitutionally be held in contempt of court for his unfair summary of trial proceedings).

Should this action reach a jury, as customary, all potential jurors with any knowledge of the case will be excused, thus disposing of Defendants' concerns in this regard.

Victoria's Secret also claims a risk of prejudice from the accusation of conduct alleged to violate the RICO statute. allegations in the pleadings and in media interviews of Katzman and her attorney. *Marisol A.* explicitly disposed of this argument, noting that "this Court is unwilling to deny access to information because of the perceived inability of the public to grasp such information." *Marisol A.,* 1996 WL 91638, at *2.

Finally, Victoria's Secret contends that this action lacks the compelling policy concerns that led Judge Ward to permit televising of the proceedings in *Marisol A.* It contends that in stark contrast to *Marisol A.,* the May 1 Argument involves purely private parties in a commercial dispute. There are no profound social, political, or legal issues to be addressed at the May 1 Argument, they note, and they contend that to the extent that this litigation is "newsworthy," the predominant interest is prurient.

It is worth noting in passing that at least some important issues are raised in this case, regardless of its merits, including consumer fraud. Further, in any class action there are some benefits that arise from widespread public information regarding the suit, particularly where notice will be received by potential class members, enabling them to contact counsel or to opt out of the class.

█ In *Marisol A.,* Judge Ward stated that he would allow broadcast of the proceedings, because "the public interest would be served" by televising the case. *Marisol A.,* 1996 WL 91638, at *2. However, that ruling did not purport to set a rigid "public interest" test for all cases. Indeed, it is particularly inappropriate for any court to exercise its discretionary powers so as to restrict access to information for the sole reason that the subject matter of a proceeding is deemed

by the court not to be newsworthy. As the First Circuit observed in a related context:

> A court may not selectively exclude news media from access to information otherwise made available for public dissemination.... [I]t allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the first amendment. Neither the courts nor any branch of government can be allowed to affect the content or tenor of the news by choreographing which news organizations have access to relevant information.

*Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir.1986) (declaring unconstitutional order exempting from protective order particular media organization); *cf. Police Dept. v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (government "may not select which issues are worth discussing and debating in public facilities").

In addition to the particulars of the present application as set forth above, the concerns, rights, and privileges of the parties, the intervenor, and the public must be assessed, including the possible constitutional impropriety of excluding cameras from civil court proceedings, an issue neither raised nor briefed by the parties.

This Court's persuasion on this issue is another factor compelling the exercise of discretion in favor of Court TV, although not necessary to the decision in light of the considerations already set forth.

 The First Amendment requires that court proceedings be open to the public, and by extension the news media, absent the most clearly articulated and compelling reasons for closing them in a particular circumstance. It has long been recognized that "[w]hat transpires in the court room is public property," *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947), particularly in light of the unquestioned proposition, articulated by Justice Frankfurter, that "[o]ne of the demands of a democratic society is that the public should know what goes on in courts...." *Maryland v. Baltimore Radio Show, Inc.*, 338 U.S. 912, 920, 70 S.Ct. 252, 255, 94 L.Ed. 562

(1950) (*denying cert.* to 193 Md. 300, 67 A.2d 497 (1949)).

Our Court of Appeals has recognized that "there is an abundance of support in the cases for a constitutionally grounded public right of access to the courtroom." *Westmoreland v. Columbia Broadcasting Sys., Inc.*, 752 F.2d 16, 22 (2d Cir.1985). In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court for the first time "unequivocally h[e]ld[ ] that an arbitrary interference with access to [court proceedings] is an abridgement of the freedoms of speech and of the press protected by the first amendment." *Id.* at 583, 100 S.Ct. at 2830–31 (Stevens, J., concurring). The Supreme Court later held that the guarantee of public proceedings in criminal trials includes the *voir dire* process, *Press–Enterprise Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) and access to transcripts of proceedings. *Press–Enterprise Co. v. Superior Court of California, Riverside Cty.*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1985). As the *Richmond Newspapers* Court noted, "throughout its evolution, the trial has been open to all who cared to observe," and such openness is essential to the perception of fairness in the administration of justice. *Id.* at 564–71, 104 S.Ct. at 2821–24. Openness carries with it the right to speak or print court proceedings or portions of them.

Moreover, in the context of the right of press access to the courtroom, there can no longer be a meaningful distinction between the print press and the electronic media. As Justice Stewart has observed:

> That the First Amendment speaks separately of freedom of speech and freedom of the press is no constitutional accident, but an acknowledgement of the critical role played by the press in American society. The Constitution requires sensitivity to that role, and to the special needs of the press in performing it effectively. A person touring [a] jail can grasp its reality with his own eyes and ears. But if a television reporter is to convey the jail's sights and sounds to those who cannot

personally visit the place, he must use cameras and sound equipment. In short, terms of access that are reasonably imposed on individual members of the public may, if they impede effective reporting without sufficient justification, be unreasonable as applied to journalists who are there to convey to the general public what the visitors see.

*Houchins v. KQED, Inc.,* 438 U.S. 1, 17, 98 S.Ct. 2588, 2598, 57 L.Ed.2d 553 (1978) (Stewart, J., concurring).

The Court of Appeals ruled in *Westmoreland* that it was "not yet prepared" to recognize a constitutional right to televise court proceedings. *Westmoreland* confronted a challenge to a denial by this district's Board of Judges of a waiver to the Former Rule 7 sought by the Cable News Network ("CNN"). Both parties to the action had consented to having the proceedings broadcast. The *Westmoreland* court reaffirmed the public's right to attend trials and the inclusion of the news media within the public. *Id.* at 22. The Court noted CNN's argument that:

> because a courtroom is so small that not every person who wishes to attend can be accommodated or can even arrange to be physically present, the public's rights are wholly diluted. The public may read about the trial from the printed transcript or a newspaper account only after some delay, or it may receive radio or television reports similarly filtered through a reporter, with no opportunity to hear and observe directly the trial in process. The public, CNN argues, is relegated by the operation of the rule to "qualitatively inferior, stale and wooden interpretations of what occurred."

*Id.* at 23. But, the Court held,

> There is a long leap, however, between a public right under the First Amendment to attend trials and a public right under the First Amendment to see a given trial televised. It is a leap that is not supported by history. It is a leap that we are not yet prepared to take. It is a leap that many federal judges and, indeed, apparently the judges of the Southern District of New York ... oppose.

*Id.* The Court then articulated more specifically the concerns that, aside from history, kept it from making that leap, noting that:

> There may indeed come a time when the experimentation with television coverage establishes that the concerns with the expenditure of judicial time on administration and oversight of broadcasting; the necessity of sequestering juries so that they will not look at the television program of the trial itself; the difficulty of empaneling an impartial jury in the case of retrial; the necessity of larger jury panels or increased use of marshalls; the psychological effect on witnesses, jurors, lawyers and judges; and related considerations of "solemnity," and "dignity," and the like are considered secondary or basically irrelevant as impediments to the search for truth when a given case is televised. At such a time the presumption may well be that all trials should be televised, or televisable. ...

*Id.*

*Westmoreland* relied in part on the Supreme Court's holding in *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), that the press' First Amendment right to access to a criminal trial did not include the right to televise that trial. The *Estes* Court explicitly recognized that its holding ultimately relied on the then-state of technology, and its statement that "when the advances in [technology] permit reporting by ... television without [the] present hazards to a fair trial, we will have another case." 381 U.S. at 540, 85 S.Ct. at 1631.

Twelve years after the *Westmoreland* decision and twenty-two years after the *Estes* holding, the advances in technology and the above-described experiments have demonstrated that the stated objections can readily be addressed and should no longer stand as a bar to a presumptive First Amendment right of the press to televise as well as publish court proceedings, and of the public to view those proceedings on television.

### Conclusion

The balance of factors considered above, even excluding the constitutional concerns, weigh heavily in favor of granting the appli-

cation of Court TV. Permission is therefore granted to film the May 1 Argument and to televise it.

In order to insure an appropriate procedure for the argument, a pre-motion conference will be held in Courtroom 18C at twelve o'clock noon on April 30, 1996, to be attended by counsel for the parties and Court TV.

It is so ordered.