*919 OPINION OF THE COURT
Dominic R. Massaro, J.
The issue presented on this application — the spectre of race-based jury nullification having arisen at trial — is whether the People are entitled to a jury instruction which affirmatively states that the propriety of search and seizure is beyond the jury’s province to decide. The court is duty bound to uphold the law, and the law requires such appropriate instruction.
FACTUAL SETTINGS
O. B. Douglas was arrested and indicted for the crimes of criminal possession of a weapon in the third (Penal Law § 265.02 [4]) and fourth (Penal Law § 265.01 [1]) degrees, and criminal possession of handcuffs (Administrative Code of City of NY § 10-147). Seeking to preclude the introduction of the weapon and handcuffs at trial, Mr. Douglas moved for and was granted a suppression hearing. The hearing testimony indicated that the police, upon observing the vehicle in which Mr. Douglas was a passenger, stopped it for a traffic violation. It was noted that defendant and the driver were black men, and that thé police officers were white. Responding to a request for identification, Mr. Douglas reached into a waist bag he was wearing, exposing a gun; it was seized and defendant was asked to step out from the vehicle; the handcuffs were recovered upon his being searched.
After scrutinizing the stop for a Vehicle and Traffic Law violation for which a summons was issued (see, People v Bernier, 245 AD2d 137 [1st Dept 1997]; People v Watson, 157 AD2d 476 [1st Dept 1990]), the court determined that it was not pretextual, as claimed by defendant, and that the police had not exceeded the scope of proper conduct in halting the vehicle and questioning its occupants (see, People v Spencer, 84 NY2d 749 [1995]; People v Martinez, 246 AD2d 456 [1st Dept 1998]; People v Washington, 238 AD2d 43 [1st Dept 1998]; cf., Whren v United States, 517 US 806 [1996]). Hence, Mr. Douglas’ suppression motion was denied and the gun and handcuffs were admitted into evidence at trial.
During trial, defendant attempted to focus the jury’s attention on the circumstances surrounding the viewing of the gun by the police. His strategy was to elicit testimony designed to discredit the testifying officer’s recounting of its discovery. Surely this is permissible. The driver of the vehicle then testified for the defense; it was he who brought forth the “race card” vis-a-vis the stop. Thereafter, Mr. Douglas argued for permission to summarize his case by questioning “why they *920 [the police] stopped the car.”[2] The court would not condone it. Defendant’s attempt to discredit the People’s witnesses through nonrelevant prejudicial inference, the court ruled, would go beyond the realm of permissibility and contravene the court’s authority to instruct the jury on the law. Despite caution, defendant’s summation nonetheless posited that Mr. Douglas was “set up” and “they [the police] stopped the car [because] they just did not like something about the people in the car.”[3]
In essence, Mr. Douglas invited the jury, comprised largely of African-Americans, directly or indirectly as the case may be, to acquit him solely on the basis that the seizure of the weapon and handcuffs from his person was unlawful and arose out of an impermissible pretextual stop based on racial bias. Invitations such as the instant one have the effect of nullifying any finding that the People have proven beyond a reasonable doubt the elements of a crime(s) submitted to a jury for consideration. It is for this reason that the court, over Mr. Douglas’ objection, granted the People’s request for a jury instruction which affirmatively stated that the Fourth Amendment issue of search and seizure was beyond their province (see, People v Hamlin, 71 NY2d 750 [1988]).[4]
JURY NULLIFICATION
It is axiomatic in the American justice system that a jury’s role at trial is limited to finding the facts. Jury “[n]unification occurs when a jury — based on its own sense of justice or fairness — refuses to follow the law and convict in a particular case even though the facts seem to allow no other conclusion but guilt” (Weinstein, Considering Jury ‘Nullification’: When May and Should a Jury Reject the Law to do Justice, 30 Am Grim L Rev 239 [1993]; see generally, Courselle, Bench Memorandum, “The First Monday in October” Program, Office of Appellate Defender [1997]). Renewed attention to the doctrine seeks to encourage abdication of the jury’s primary function to apply the law, that is, the legal definition of a crime to the evidence and to convict if it is satisfied that each element of said crime has been established beyond a reasonable doubt. The Fully *921 Informed Jury Association, for example, has for a decade kept the issue in the public eye. The Association draws supporters from across the political and social spectrums, including: “ ‘[conservatives and constitutionalists, liberals and progressives, libertarians, populists, greens, gun owners, peace groups, taxpayer rights groups, home schoolers, alternative medicine practitioners, drug decriminalization groups, criminal trial lawyers, seat belt and helmet law activists, environmentalists, women’s groups, anti-nuclear groups, [and] ethnic minorities’ ” (Scheflin and Van Dyke, Merciful Juries: The Resilience of Jury Nullification, 48 Wash & Lee L Rev 165, 176-177 [1991]).
Anti-abortion activists have more recently encouraged jury nullification in trials of people engaged in protests at abortion and family-planning clinics (see, United States v Lynch, 952 F Supp 167 [SD NY 1997] [Trial Judges, like juries, have power to engage in nullification], affd 104 F3d 357, cert denied 520 US 1170 [1997]).
RACIAL MOTIVATIONS
Much recent debate has centered around issues of racially motivated jury nullification (see, e.g., Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 Yale LJ 677 [1995]; Leipold, The Dangers of Race-Based Jury Nullification: A Response to Professor Butler, 44 UCLA L Rev 109 [1996]; Butler, The Evil of American Criminal Justice: A Reply, 44 UCLA L Rev 143 [1996]; see also, Abramson, After the O.J. Trial: The Quest to Create Color-blind Juries; Butler, Jury Nullification: Practice for Blacks is Moral and Legal, Race and Jury at the Crossroads [Franklin H. Williams Judicial Commn on Minorities 1996]). Professor Butler provocatively advocates jury nullification as a tool of African-American self-determination, an operational strategy to confront what he perceives to be pervasive racial inequities in the criminal justice system. While conceding that “[t]here is no question that jury nullification is subversive of the rule of law”,[5] he argues that African-American jurors have a moral obligation “to exercise their power in the best interests of the black community” and to acquit in nonviolent criminal cases where *922 the defendant, though factually guilty, is black.[6] This, he maintains, will diminish the racially disparate impact of the criminal law, help bring about beneficial legal reform and improve the African-American communities that are now crippled by excessive imprisonment of their numbers.[7] This position has come under attack, not only because it encourages jurors to disregard the law, but also because it is premised on a rejection of the criminal justice system.[8]
The rhetoric notwithstanding, it may correctly be stated that nullification advocates follow in the footsteps of a hallowed tradition, one which reaches back to the earliest days of our colonial experience. Juries at one time explicitly possessed the power to judge the law as well as the facts, and thus to enter a nullification verdict.
HALLOWED TRADITION
The right of trial by jury was designed “to guard against a spirit of oppression and tyrannny [sic] on the part of rulers” and “was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties” (2 Story, Commentaries on the Constitution of the United States 541, 540 [4th ed 1873]; see also, 4 Blackstone, Commentaries on the Laws of England 342 [1769]; United States v Gaudin, 515 US 506 [1995]; Duncan v Louisiana, 391 US 145 [1968]). From the very beginning, however, Judges exercised considerable power over the prosecution process as a whole and over juries in particular. Even following a verdict, a Judge could force a jury to reconsider, and if its members proved obstinate, fine, imprison or prosecute them on the theory they had violated their oaths (see generally, Lawson, Lawless Juries?, Twelve Good Men and True: The Criminal Trial Jury in England, 1200-1800 [Cockburn and Green, editors 1988]).
Responding to the Crown’s increased use of criminal prosecutions as a means of silencing opponents during the political upheavals that rocked England during the 17th century, *923 religious and political dissenters began asserting the jury’s right to judge the legality of the law. This culminated with the ruling in Bushel’s Case (125 Eng Rep 1006, 1013 [PC 1670]), which effectively insulated the jury’s decisionmaking from court interference “wherein they resolve both law and fact complicatedly, and not the fact by itself’. The opinion, arising from the foreman’s habeas corpus petition, held that the jury could not be punished for acquitting the Quaker William Penn of seditious preaching (of religion), even if the Trial Judge believed such a verdict contrary to the evidence. “Although criminal juries in England following Bushel’s Case possessed the raw power to ignore the law as given by the judge, they never acquired the legal right to do so. In America, by contrast, the right of the jury independently to decide questions of law was widely recognized until well into the nineteenth century. Not only did juries have the right to judge the law, ‘counsel had the right to argue the law — its interpretation and its validity — to the jury.’ ” (Note, Opposing Jury Nullification: Law, Policy, and Prosecutorial Strategy, 85 Geo LJ 191, 198 [1996].)
English in origin, there evolved in America an undoubted jury prerogative-in-fact derived from the power to bring in a general verdict of “not guilty” in a criminal case, nonreviewable and irreversible by the court (see, Standefer v United States, 447 US 10 [1980]; Green v United States, 355 US 184 [1957]). As Professor Wigmore observed: “The jury, in the privacy of its retirement, adjusts the general rule of law to the justice of the particular case” (Wigmore, A Program for the Trial of Jury Trial, 12 J of Am Judicature Socy 166, 170 [1929]).
“The pages of history shine on instances of the jury’s exercise of its prerogative to disregard uncontradicted evidence and instructions of the judge” (United States v Dougherty, 473 F2d 1113, 1130 [DC Cir 1972]). What student of the American saga knows not of John Peter Zenger. In 1735, Zenger published the Weekly Journal, a New York newspaper, which was highly critical of the royal governor, who promptly shut it down. Arrested on charges of seditious libel, Zenger admitted publishing the criticism, but stated that what he published was the truth, then not recognized as a legal defense. Despite the Judge’s instruction, the jury refused to enforce a law that made it a crime to criticize the government, thus laying cornerstones of freedom of speech and of a free press.
Nor is there any lack of notable expression(s) from the Framers, Federalists and Anti-Federalists alike, or early prominent *924 members of the judiciary, in support of the necessity for the practice of jury nullification as a protection against the exercise of arbitrary and abusive power — that jurors had “a duty to find a verdict according to their own conscience, though in opposition to the direction of the court; that their power signified a right” (United States v Dougherty, supra, at 1132).[9] This served as the ultimate protection against tyranny and injustice and was an integral feature of the birth of our Nation.[10] As the 19th century dawned, juries continued to display the fierce independence exhibited under colonial rule. The wave of confidence generated by the recent victory over England saw Americans of all stations defend the law-making function of the jury “with an extraordinarily insistent vitality” (Howe, Juries as Judges of Criminal Law, 52 Harv L Rev 582 [1939]; see generally, Scheflin and Van Dyke, Jury Nullification: The Contours of a Controversy, 43 Law & Contemp Probs 51 [Autumn 1980]).
The clash of contending forces staking out the direction of the government of the newly established Republic was resolved in political terms early on by reforming, but sustaining without radical change, the status of the courts as central to the democratic process for improving the law. Soon, the youthful passion for independence and the casting off the yoke of tyranny stood in sharp contrast to the practical reality that stability was a necessary ingredient for national growth. As time passed, the idea that juries were competent to interpret the laws began to recede, reflecting the sentiments of an established nation rather than the spirit of a revolutionary one. This inaugurated a progressive constitutional revolution that has since changed the entire landscape of American law and life, elevating the moral fundamentality of the democratic *925 order that the value of equality is not mutually exclusive from that of liberty. And while, as a practical matter, juries have, and continue to exercise the power to engage in nullification, its exercise implicates a fundamental conflict between the rule of law and the jury’s historic role as a restraint on the arbitrary power to oppress. Indeed, the democratic purposes initially served by such juries have since come to be better served by other democratic institutions.[11]
THE LAW
The seminal case of Marbury v Madison (1 Cranch [5 US] 137, 177 [1803]) established the rule that “[i]t is emphatically the province and duty of the judicial department to say what the law is”. In United States v Battiste (2 Sumn 240, No. 14, 545, 24 Fed Cas 1042, 1043 [Cir Ct, D Mass 1835]), Justice Story set forth that “[i]t is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court”. This is the modern rule of the jury as the trier of fact.
By the end of the 19th century, the jury had changed from an intimate institution into a more impersonal arbiter of impartial justice in a more complicated conception of community. And judicial thinking had clearly shifted and conclusively determined it to be “the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence” (Sparf v United States, 156 US 51, 102 [1895]).
The question in Sparf was whether a court transcended its authority when saying “ ‘a jury is expected to be governed by law, and the law it should receive from the court.’ ” (Sparf v United States, supra, at 63.) Justice John Marshall Harlan held that a jury has “ ‘the physical power to disregard the law, as laid down to them by the court. But I deny that * * * they have the moral right to decide the law according to their own notions or pleasure * * * the jury should respond as to the facts, and the court as to the law * * * This is the right of every citizen, and it is his only protection’ ” (at 74, quoting *926 United States v Battiste, supra). The court criticized jury nullification as contrary to the rule of law. Sparf, then, settled the issue against a jury’s right to decide questions of law. The alternative approach, the Court intoned, would replace a “government of laws” with a “government of men.” (Sparf v United States, at 103.) Since Sparf, it has been a commonplace understanding that criminal juries have the power, but not the right, to nullify the law before them.[12]
For more than a century, the United States Supreme Court has followed this precedent that the right to decide the law belongs to the court, not to the jury (see, e.g., United States v Gaudin, 515 US 506, supra; Berra v United States, 351 US 131 [1956]; Hepner v United States, 213 US 103 [1909]). Jury nullification is “an ‘assumption of a power which [the jury has] no right to exercise’ ” (United States v Powell, 469 US 57, 66 [1984], quoting Dunn v United States, 284 US 390 [1932]). “A jury has no more ‘right’ to find a ‘guilty” defendant ‘not guilty’ than it has to find a ‘not guilty’ defendant ‘guilty,’ and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power” (United States v Washington, 705 F2d 489, 494 [DC Cir 1983]).
CIVIC FRAGMENTATION
The idea of deciding cases on the basis of racial politics as opposed to reasonable doubt is not new; however, its modern-day proponents advance the logic that if the system routinely fails, here, African-American defendants, then African-Americans must abandon the system.[13] This goes beyond the lofty premise of juror lenity in refusing to enforce unjust laws or laws that have been unjustly enforced. Race-based jury nul *927 lification was a repellan! practice when white supremacists on southern juries refused to convict those accused of violence against African-Americans;[14] it is no better practiced by black jurors, even if motivated by legitimate anger. There is an unfortunate yet increasing perception that African-American jurors vote to acquit defendants for racial reasons. It has a particular resonance in this venue.[15] Racial allegiance, white or black, has no place in a court of law; in the jury room, judgment and discretion are inseparable.
American jurisprudence demands equal application of the law; it is the bedrock upon which our system of justice is premised. The value of jury nullification, this “great corrective of law in its actual administration” (Pound, Law in Books and Law in Action, 44 Am L Rev 12, 18 [1910]), pales in comparison when the liberty interest vindicated by the verdict is counter to a commonsense understanding that the pending criminal charge is based neither on principle nor rooted in arbitrary or excessive government; rather, that a defendant is before the bar of justice because of a blameworthy violation of a valid law designed to protect society.
“We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent” (United States v Thomas, 116 F3d 606, 614 [2d Cir 1997], supra).
NEW YORK JURISPRUDENCE
“ ‘While there is nothing to prevent a petit jury from acquitting although finding that the prosecution has proven its case, *928 this so-called ‘mercy-dispensing power’ * * * is not a legally sanctioned function of the jury and should not be encouraged by the court’ ” (People v Weinberg, 83 NY2d 262, 268 [1994], quoting People v Goetz, 73 NY2d 751, 752 [1988], cert denied 489 US 1053 [1989]; see also, People v Sullivan, 68 NY2d 495 [1986]; People v Mussenden, 308 NY 558 [1955]; cf., People v Tucker, 55 NY2d 1 [1981]; People v Berkowitz, 50 NY2d 333 [1980]). Furthermore, Goetz (at 752) admonishes that, if the jury finds that the State has proved its case beyond a reasonable doubt, it “must” convict.
New York trial courts have a mandated duty to prevent improper and impermissive nullification conduct. It has long been recognized in our jurisprudence that “it is [the jury’s] duty to be governed by the instructions of the court as to all legal questions * * * [t]hey have the power to do otherwise, but the exercise of such power cannot be regarded as rightful” (Duffy v People, 26 NY 588, 593 [1863]; see also, Safford v People, 1 Parker Cr Rep 474 [1854]; People v Finnegan, 1 Parker Cr Rep 147 [1848]).
Furthermore, our New York Pattern Criminal Jury Instructions, in no uncertain terms, informs jurors that it is their duty to follow the law as explained by the court (see generally, CJI[NY]2d; CPL 300.10).[16] If it is established during voir dire that a prospective juror is unwilling to do so, that juror may be excused for cause (see, CPL 270.20).
CONCLUSION
Jury nullification, by definition, is a violation of a juror’s oath to apply the law as instructed by the court. Notwithstanding, the power of a jury to return a not guilty verdict contrary to the apparent weight of the evidence has been an accepted, indeed cherished, feature of our jury system since earliest times. The common-law courts recognized that juries in criminal cases sometimes exercise discretionary judgment in order to return a general verdict of nonguilt; clearly, in the era fol *929 lowing the Revolution juries were routinely instructed that they were not bound by the Judge’s instruction on the law, but were free to develop their own interpretation of its applicability. Jury nullification thus enjoyed an auspicious history well into the last century.[17] This noble doctrine made a great deal of sense at a time when American law was in its infancy and American jurisprudence not yet fully developed.[18]
There is no moral justification in present-day America to separate liberty and equality; and “liberty regulated by law is the underlying principle of our institutions” (Sparf v United States, 156 US, supra, at 103); “[p]ublic and private safety alike would be in peril, if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court and become a law unto themselves” (see, Sparf v United States, supra, at 101). Nor is there a moral responsibility for jurors of any race to use nullification to reintroduce into the community those whose crimes are destructive of its social fabric, and who otherwise are deserving of conviction under any analysis other than that of proof of guilt beyond a reasonable doubt. Juries cannot be “the conscience of the community” (United States v Spock, 416 F2d 165, 182 [1st Cir 1969]) by violating their oath to apply the law to the evidence. Historically, the concept of nullification was justified solely as a byproduct of the careful defense of other values deemed more fundamental precisely because they proved beneficial to the commonweal. Nullification should not, and cannot without greater cost, be transformed into a more robust affirmative grant of power.
Conceptually, jury nullification is logically incompatible with applying the law, and to do so diminishes legality by fostering the perception that individuals can determine the boundaries of lawful conduct. This can only serve to undermine public confidence in the normative effect of rule of law. “ ‘Toleration of such conduct would not be democratic * * * but inevitably anarchic’ ” (see, United States v Dougherty, 473 F2d, supra, at 1134).
*930 “In all criminal prosecutions, the accused shall enjoy the right to * * * trial, by an impartial jury” (US Const 6th Amend; see also, NY Const, art I, § 2). By extension, this right includes the right to a jury that is willing to apply the law as instructed by the court (see, Adams v Texas, 448 US 38 [1980]). In this instance, by charging that, while the credibility of each and every witness is for the jury to determine, the lawfulness of police conduct in stopping the automobile in which defendant was a passenger is not a question of fact for consideration, this court sought to discourage the jury from engaging in a nonlegally sanctioned function in reaching its verdict(s). “Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen” (Smith v Phillips, 455 US 209, 217 [1982]).
The jury system is an effort to secure participatory democracy; democratic theory, however, does not countenance extralegal lawmaking. Political legitimacy suggests that the jury room is an improper setting to pass judgment on the wisdom of policy choices democratically determined by duly elected representatives. This has no parallel to treating, with arbitrary oppression by regal fiat. While in an extraordinary case calling upon high conscience, if at all, the ends of justice may cause jurors to consider their own sense of what is just and proper, resulting in a legally indefensible verdict, this is wholly distinct from the court’s duty to uphold the law. The very essence of the judicial function is to declare the law’s applicability — even if a juror does not agree with it.
In a society as multicultural as our own, jurors sit not as representatives of discrete groups, but as citizens representing the public interest. It is for this reason that trial courts must insist that jurors will consider and decide the facts impartially, especially to forestall favor, that is, to prevent a juror’s conduct that violates his or her sworn duty to conscientiously apply the law as instructed by the court. Neither democracy nor the jury is served by brokering justice based on race.[19]
“Nothing would be more pernicious to the jury system than for society to presume that persons of different backgrounds go *931 to the jury room to voice prejudice” (J. E. B. v Alabama ex rel. T. B., 511 US 127, 154 [1994] [Kennedy, J., concurring]).

. Transcript, July 6, 1998.

. Ibid.

. “ T instruct you that whether the approach and stop of defendant was lawful is not for you to decide. That subject involves a question of law that is not within the province of the jury to determine. Your duty as jurors is to determine whether the People have proven all of the elements of the crime charged beyond a reasonable doubt’ ” (People v Wright, 168 Misc 2d 787, 788 [1996]).

. Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, op. cit., at 706; “My goal is the subversion of American criminal justice” (id., at 680).

. Id., at 715. “[fit is the moral responsibility of black jurors to emancipate some guilty black outlaws” (id., at 679).

. Between 1965 and 1992, the arrest rate for African-Americans was between four and seven times greater than the arrest rate for whites (see, Bureau of Justice Statistics, United States Dept of Justice, Sourcebook of Criminal Justice Statistics 1994, at 378 [1995]).

. “[B]lack people can ‘opt out’ of American criminal law” (Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, op. cit., at 714).

. John Jay, the first Chief Justice of the United States, stated that the jury has the right to judge both “the law as well as the fact in controversy” (Georgia v Brailsford, 3 Dallas [3 US] 1, 4 [1794]).

. Perhaps the most important reason why early American juries were accorded the right to decide questions of law was the central role they had played in opposing the tyrannical rule of the English government in the years leading up to the Revolution. Colonial juries regularly refused to enforce the various Navigation Acts, which restricted maritime commerce, or to convict Americans accused of avoiding the imposition of levies. The English responded to these flagrant acts of jury nullification, in part, by extending the jurisdiction of the vice-admiralty courts, which functioned without juries, and by declaring that colonists charged with treason would be tried in England. These actions caused outrage and constituted one of the major grievances that led to the Revolution. Among the many “injuries and usurpations” enumerated in the Declaration of Independence, King George III was charged with “depriving us in many cases, of the benefits of Trial by Jury.”

. “[I]n the colonial era, American juries were the governmental bodies most representative of their communities. With independence, state legislatures and other agencies probably represented the whole society better. More democratic lawmaking left little legitimate role for the jury’s law-intuiting (and law-defying) functions. The democratic purposes initially served by colonial juries came to be better served by other institutions” (Alschuler and Deiss, A Brief History of the Criminal Jury in the United States, 61 U Chi L Rev 867, 917 [1994]).

. The State Constitutions of both Indiana and Maryland yet provide that jurors are judges of both the law and facts. Juries in those States continue to be instructed on the prerogative to nullify the law in criminal cases.

. To the contrary: 76% of African-Americans surveyed favored imposing more severe prison sentences as a way to deal with the crime problem (Sourcebook, op. cit., at 172 [Gallup Poll]). Sixty-eight per cent of blacks surveyed said that they would approve of building more prisons so that longer sentences could be given (Sourcebook, op. cit., at 178 [ABC News Poll]). Two-thirds also approved of a “three strikes and you’re out” provision which would impose a mandatory life sentence for a third-time violent felon (Sourcebook, op. cit., at 176 [ABC News Poll]). By a two-to-one margin (62% to 31%), black citizens favored treating juveniles who commit crimes the same as adults (Sourcebook, op. cit., at 178 [Gallup Poll]).

. “[A]lthough the early history of our country includes the occasional Zenger trial or acquittals in fugitive slave cases, more recent history presents numerous and notorious examples of jurors nullifying — cases that reveal the destructive potential of a practice ** * * rightly termed a ‘sabotage of justice’ * * * Consider, for example, the two hung juries in the 1964 trials of Byron De La Beckwith in Mississippi for the murder of NAACP field secretary Medgar Evers, or the 1955 acquittal of J.W. Millam and Roy Bryant for the murder of fourteen-year-old Emmett Till * * * shameful examples of how nullification has been used to sanction murder and lynching’’ (United States v Thomas, 116 F3d 606, 616 [2d Cir 1997]).

. “The race factor seems particularly evident in such urban environments as [Bronx County], where juries are more than 80% black and Hispanic. There, black defendants are acquitted in felony cases 47.6% of the time — nearly three times the national acquittal rate of 17% for all races. Hispanics are acquitted 37.6% of the time. This is so even though the majority of crime victims in the Bronx are black or Hispanic” (Holden, Cohen and de Lisser, Color Blinded? Race Seems to Play An Increasing Role In Many Jury Verdicts, Wall St J, Oct. 4, 1995, at Al).

. But see, 1995 NY Senate Bill 4157 (218th Session): “an act to amend the criminal procedure law, in relation to a court’s charge to a jury” that “upon request of a defendant, the court must also state that the jury HAS THE FINAL AUTHORITY TO DECIDE WHETHER OR NOT TO APPLY THE LAW TO THE FACTS BEFORE IT, THAT IT IS APPROPRIATE TO BRING INTO ITS DELIBERATIONS THE FEELINGS OF THE COMMUNITY AND ITS OWN FEELINGS BASED ON CONSCIENCE, AND THAT NOTHING WOULD BAR THE JURY FROM ACQUITTING THE DEFENDANT IF rr feels that the law, as applied to the facts, would produce an inequitable or unjust result.” Referred to Senate Committee on Codes and expired therein.

. The 19th century acquittals by northern juries in prosecutions under the Fugitive Slave Act of 1850 is, perhaps, our country’s more honorable example of “benevolent nullification”.

. Historians suggest three reasons for this unique situation: first, the almost total absence of an established legal profession; second, the pervasive influence of natural rights philosophy; and third, the shared experience of living under — and then rebelling against — a tyrannical form of government (see generally, Alschuler and Deiss, A Brief History of the Criminal Jury in the United States, op. cit.).

. “Race-based decisionmaking * * * is wrong because verdicts will inevitably be based on stereotypes that are harmful to all members of the group; wrong because those who are not part of the favored group are treated more harshly for reasons unrelated to their blameworthiness; wrong because it helps polarize a society that is already struggling with racial division; and most tragically, wrong because it raises the flag of surrender in the fight for *931 equality” (Leipold, The Dangers of Race-Based, Jury Nullification: A Response to Professor Butler, op. cit., at 139).