OPINION OF THE COURT
William H. Bristol, J.
Introduction
Fundamental to our criminal justice system is the constitutionally protected right of a defendant to a fair trial.[1] “[U]nbroken, uncontradicted history, supported by reasons as valid today as in centuries past,” binds courts “to conclude that a presumption of openness inheres in the very nature of a criminal trial under our system of justice.”[2] Of similar fundamental constitutional nature is liberty of the press. Congress “shall make no law * * * abridging the freedom * * * of the press;”[3] the New York State Legislature is constitutionally admonished that “no law shall be passed to restrain or abridge the liberty * * * of the press.”[4] These two fundamental rights — that of the accused to a fair trial open to the public and that of the press to freely report as it wishes — have generally coexisted in a harmonious manner in New York State and, indeed, in 48 States of this Nation.[5] But, because the authority of Civil Rights Law § 52 was resuscitated, in 1997, by the failure of the New York State Legislature to renew Judiciary Law § 218 (which had allowed the press not only to report from outside the courtroom what it observed inside the courtroom but also to broadcast and televise trials from inside the public courtroom), the press is now restrained in how it may report what it observes inside the courtroom. Specifically, Civil Rights Law § 52, in relevant part, states: “No person, firm, association or *141 corporation shall televise, broadcast, take motion pictures or arrange for the televising, broadcasting, or taking of motion pictures within this state of proceedings, in which the testimony of witnesses by subpoena or other compulsory process is or may be taken, conducted by a court.”
Reasonable people of good faith may disagree about whether the broadcasting of public trials represents positive or negative public policy. But it is the duty of courts to honor the Constitution and interpret the law, not to decide public policy. Here, the legal questions presented to this court are: does Civil Rights Law § 52 violate either the United States or the New York State Constitution, and, if it does, will allowing the press to broadcast this trial violate the defendant’s right to a fair trial?
For the reasons that follow, this court is of the opinion and decides that Civil Rights Law § 52 does violate article I, § 8 of the New York State Constitution and that with careful rules, rigorously followed, the coverage by broadcast media from the public courtroom will not deny the defendant his right to a fair trial.
Procedural Posture
This application by the proposed intervenors, brought by way of order to show cause, requests an order granting the following relief:
(1) permission to “intervene” in the above-captioned matter;
(2) permission to televise the trial in this action, from opening statements to verdict, and, in the event of a conviction, to televise any postconviction proceedings;
(3) permission to follow the coverage guidelines contained in Judiciary Law former § 218 and part 131 of the Rules of the Chief Administrator of the Courts (22 NYCRR) on the ground that section 52 of the Civil Rights Law is unconstitutional;
(4) permission for Gannett Co., Inc. to take still photographs/ images; and
(5) such other and further relief as the court deems just and proper.
On March 9, 2000, the proposed intervenors, by their attorneys, Underberg & Kessler, L. L. P., Sharon P. Stiller, Esq. and Paul F. Keneally, Esq., of counsel (for proposed intervenors WOKR-TV, WHEC-TV, WUHF-TV, WROC-TV and R-NEWS), and Nixon Peabody L. L. P., by Richard D. Rochford, Jr., Esq. (for proposed intervener Gannett Co., Inc.), appeared and *142 argued before this court in support of their applications. District Attorney, Howard R. Relin, by Wendy Evans Lehmann, Esq., of counsel, and Capital Defender, Kevin Doyle, by William T. Easton, Esq., Deputy Capital Defender, appeared and argued in opposition to this application. After listening to the extensive arguments of all counsel, the court reserved decision.
Substantive Decision
A. Intervenor Status and Jurisdiction
Defense counsel argues that the applicants are not intervenors within the meaning of the Civil Practice Law and Rules and, thus, are not properly before this court. He also argues that this court has no authority to hear the instant application. But, at its essence, this court is being asked to decide who may enter the courtroom in which it presides and to control how those who enter may behave. Asking to be heard on their request to enter and act in the courtroom, the press may not be acting as “interveners” in the CPLR sense. Perhaps inartfully worded, asking to “intervene” is essentially a request of the court, involving a case pending before it, for direction on how the Judge shall control his/her own courtroom procedures. Judge Frederick D. Dugan, in Matter of People v Little (89 Misc 2d 742, 745 [Yates County Ct 1977], affd no opn 60 AD2d 797 [4th Dept 1977]), explained it best:
“Under the inherent powers doctrine a court has all powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective. These powers are inherent in the sense that they exist because the court exists; the court is, therefore, it has the powers reasonably required to act as an efficient court. Inherent judicial powers derive not from legislative grant or specific constitutional provision, but from the fact it is a court which has been created, and to be a court required certain incidental powers in the nature of things. (Carrigan, Inherent Powers of the Courts, National College of the State Judiciary, Reno, Nevada [1973].)
“Under the constitutionally mandated separation of powers, the three traditional branches of government — executive, legislative and judicial — are to be separate, co-ordinate and equal with each free to govern, manage and administer the business in its own sphere without restriction, supervision on interference by the other two branches. In order to effect 'check and balance’ the courts must have inherent powers.”
Thus, for example, if a statute were to bar all women or all *143 members of a certain race or religion from entering the courtroom, then few would doubt this court’s authority to declare such statute constitutionally invalid and to throw open the doors of its public courtroom to those unlawfully barred. County Courts are regularly asked to declare statutes unconstitutional to the extent that the statute has an impact on a pending case. (See, e.g., People v Calloway, 176 Misc 2d 161 [Monroe County Ct 1998, Bristol, J.].)
“Generally, ‘representatives of the press and general public “must be given an opportunity to be heard on the question of their exclusion.” ’ Globe Newspaper Co. v. Superior Court for Norfolk Cty., 457 U.S. 596, 609 n. 24, 102 S.Ct. 2613, 2621 n. 24, 73 L.Ed.2d 248 (1982) (quoting Gannett Co. v. DePasquale, 443 U.S. 368, 401, 99 S.Ct. 2898, 2916, 61 L.Ed.2d 608 (1979) (Powell, J., concurring)).” (Katzman v Victoria’s Secret Catalogue, 923 F Supp 580, 583 [SD NY 1996].) “Important interests are best championed by those most directly affected by their impairment.” (Katzman v Victoria’s Secret Catalogue, supra, at 583.) Banned from entering the public courtroom with their video and audio equipment, the broadcast media, indeed, are “most directly affected” by Civil Rights Law § 52 and, thus, are in the best position to argue its unconstitutionality before this court. And this court has the inherent authority to “manage and administer the business in its own sphere.” (Matter of People v Little, supra, at 745.) That there may be other forums in which similar relief may be obtained does not diminish this court’s authority to do likewise. Indeed, interests of judicial economy and responsibility militate that the court most affected and that has the authority to act should deal with the issue and not pass off the responsibility of making a difficult decision to some other Judge or body.
B. Federal Law
Well known is the 1st Amendment to the United States Constitution: “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceábly to assemble, and to petition the Government for a redress of grievances.”
Although the United States Supreme Court has interpreted the 1st Amendment to guarantee the press and public a right of access to criminal trials, the court has not reached the question of whether such access encompasses the right to broadcast from the courtroom. (See, Globe Newspaper Co. v Superior Ct., 457 US 596 [1982], supra; Richmond Newspapers v Virginia, 448 US 555 [1980], supra.)
*144 Writing for the majority in Richmond Newspapers v Virginia (supra, at 576-577), Mr. Chief Justice Burger, after a thorough review of the historical underpinnings of the 1st Amendment’s protection of freedom of the press, stated: “It is not crucial whether we describe this right to attend criminal trials to hear, see, and communicate observations concerning them as a ‘right of access,’ cf. Gannett, supra, [443 US,] at 397 (Powell, J., concurring); Saxbe v. Washington Post Co., 417 U. S. 843 (1974); Pell v. Procunier, 417 U. S. 817 (1974), [n 11] or a ‘right to gather information,’ for we have recognized that ‘without some protection for seeking out the news, freedom of the press could be eviscerated.’ Branzburg v. Hayes, 408 U. S. 665, 681 (1972). The explicit, guaranteed rights to speak and to publish concerning what takes place at a trial would lose much meaning if access to observe the trial could, as it was here, be foreclosed arbitrarily.”
Federal District Courts and Circuit Courts of Appeals differ in their analysis of whether 1st Amendment access to courtrooms includes the right to broadcast from courtrooms. On September 13, 1990, the Federal Judicial Conference, a policy-making body made up of 26 Federal Judges and chaired by Mr. Chief Justice Rehnquist, approved a three-year experiment allowing cameras in two appellate courts (2d and 9th Cirs) and six District Courts, beginning on July 1, 1991. Limited to civil cases, the experiment gave Judges total discretion to refuse, limit, or stop camera coverage. Although the report on the experiment recommended that coverage continue, in September 1994 the Judicial Conference terminated the experiment, effectively banning all cameras in Federal courtrooms.[6] In March 1996, the Judicial Conference relented, somewhat, to the pressures of the media in deciding (by a 14-12 vote) that a Federal Appellate Judge may allow camera access to the Federal courtroom at his or her discretion. Access, however, is severely limited; only Federal Appellate Judges, and not Federal Trial Judges, have the discretion to admit the camera.[7]
Reaction of the Federal courts to the Judicial Conference’s decision to allow appellate courts to permit broadcast media access has varied. The United States Court of Appeals for the Second Circuit has its own detailed guidelines for admitting *145 cameras in the courtroom. (See, Guidelines of Ct of Appeals for 2d Cir Concerning Cameras in Courtroom, part F of Appendix to Local Rules of 2d Cir.) Indeed, the Second Circuit has gone to the extreme and permitted the televising of trials in the Federal civil courts in New York. This defied the call from the Judicial Conference for Federal appellate courts to annul any local rules permitting camera coverage at the Federal trial level. (See, Local Rules of US Dist Cts for SD & ED NY, local civil rule 1.8 [formerly local general rule 7]; Rules of US Dist Ct for WD NY, local rule of civil procedure 83.5.)[8] Most recently, the United States District Court for the Southern District of New York in Katzman v Victoria’s Secret Catalogue (supra) permitted its proceedings to be televised. These proceedings were civil in nature and, therefore, arguably of less public importance than criminal proceedings. Significantly, the court in Katzman (supra, at 582) stated: “Court TV is a news television network, which reports on legal and judicial systems within the United States and abroad. Since its creation, Court TV has specialized in extended, complete coverage of civil and criminal trials and has televised over four hundred such trials, as well as numerous oral arguments, both on motions before trial courts and in appellate proceedings. Court TV has televised fifty-one cases in federal court, both before district courts (including this Court) and courts of appeals.”
There are other proceedings, however, in Federal courts in which cameras and microphones are banned. Federal Rules of Criminal Procedure rule 53 reads as follows:
“Rule 53. Regulation of Conduct in the Court Room[9]
“The taking of photographs in the court room during the progress of judicial proceedings or radio broadcasting of judicial proceedings from the court room shall not be permitted by the court.”
This 56-year-old rule, applicable in Federal criminal proceedings, has been examined only by Federal Courts of Appeals and not, as of yet, by the Supreme Court. Of the Federal Courts of Appeals that have considered its constitutionality (United *146 States v Hastings, 695 F2d 1278 [11th Cir 1983], cert denied sub nom. Post-Newsweek Stas. v United States, 461 US 931 [1983]; United States v Kerley, 753 F2d 617 [7th Cir 1985]; United States v Edwards, 785 F2d 1293 [5th Cir 1986]; Conway v United States, 852 F2d 187 [6th Cir 1988]), all have found such a ban to be permissible. Relying on a rational basis analysis, the courts have determined that per se restrictions, such as Federal Rules of Criminal Procedure rule 53, are constitutional so long as they “promote [ ] ‘significant governmental interests’ ” and do not “ ‘unwarrantedly abridge * * * the opportunities for the communication of thought.’ ” (United States v Hastings, supra, at 1282.) Essentially, these courts found rule 53 to be a valid “time, place and manner” restriction. Indeed, in Richmond Newspapers v Virginia (supra, at 581-582, n 18) the Court noted that: “[0]ur holding today does not mean that the First Amendment rights of the public and representatives of the press are absolute. Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, see, e. g., Cox v. New Hampshire, 312 U. S. 569 (1941), so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial. ‘[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge * * * the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.’ Id., at 574. It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets. Compare, e. g., Kovacs v. Cooper, 336 U. S. 77 (1949), with Illinois v. Allen, 397 U. S. 337 (1970), and Estes v. Texas, 381 U. S. 532 (1965). Moreover, since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated. In such situations, reasonable restrictions on general access are traditionally imposed, including preferential seating for media representatives. Cf. Gannett, 443 U. S., at 397-398 (Powell, J., concurring); Houchins v. KQED, Inc., 438 U. S. 1, 17 (1978) (Stewart, J., concurring in judgment); id., at 32 (Stevens, J., dissenting).”
When New York courts are required to apply or interpret a Federal statute, “we are bound to apply the statute as interpreted by Supreme Court decision or, absent such, in accordance with the rule established by lower Federal courts if they are in agreement.” (Flanagan v Prudential-Bache Sec., 67 NY2d 500, 506 [1986]; see also, 423 S. Salina St. v City of *147 Syracuse, 68 NY2d 474 [1986]; Eina Realty v Calixte, 178 Misc 2d 80 [Civ Ct, Kings County 1998].) Likewise, Federal courts have the final word on interpreting provisions of the United States Constitution.
Federal courts are not “in agreement”: broadcasting from inside Federal courtrooms is allowed in some situations but not in others. Federal court rules and decisions interpreting the 1st Amendment on this issue, therefore, do not dictate a State court’s outcome. This court, however, need not reach the 1st Amendment question since independent and compelling authority may be found in New York State’s own Constitution, article I, § 8.
C. Legislative Enactments — Presumption of Constitutionality
In Matter of Malpica-Orsini (36 NY2d 568, 570-571 [1975]), the Court of Appeals stated:
“a legislative enactment carries with it an exceedingly strong presumption of constitutionality; that, while this presumption is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt; that every intendment is in favor of the statute’s validity; that the party alleging unconstitutionality has a heavy burden; and that only as a last resort will courts strike down legislative enactments on the ground of unconstitutionality. Nor may courts substitute their judgment for that of the Legislature as to the wisdom and expediency of the legislation.
“There is a further presumption that the Legislature has investigated and found facts necessary to support the legislation * * * as well as the existence of a situation showing or indicating its need or desirability * * * Thus, if any state of facts, known or to be assumed, justify the law, the court’s power of inquiry ends * * *
“Under the doctrine of separation of powers, courts may not legislate * * * or extend legislation.” (See also, Matter of Van Berkel v Power, 16 NY2d 37, 40 [1965]; Fenster v Leary, 20 NY2d 309, 314 [1967]; People v Pagnotta, 25 NY2d 333, 337 [1969].)
To prevail on this motion, therefore, the proponents must demonstrate, beyond a reasonable doubt, that Civil Rights Law § 52 violates their rights protected by article I, § 8 or by United States Constitution 1st Amendment.
D. New York State Constitution
When the constitutionality of a legislative enactment is challenged, it is necessary to thoroughly analyze not only the *148 statute’s legislative history, but also the constitutional provision’s history. Article I, § 8 of the New York State Constitution, the constitutional provision implicated by the instant motion, reads in relevant part as follows: “Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.” This article, often equated with the 1st Amendment to the United States Constitution, protects New Yorkers’ freedoms of speech and of the press. Textually different from the 1st Amendment, article I, § 8 begins by affirmatively stating these freedoms, followed by a prohibition that no legislative enactment may be passed abridging them. There is no such affirmative statement in the 1st Amendment to the United States Constitution. Rather there is a legislative mandate that Congress shall make no law abridging the freedom of speech or of the press.
Article I, § 8 of the New York State Constitution was adopted at the 1821 Constitutional Convention. A review of the proceedings and debates of October 20, 1821[10] reveals that the delegates’ primary concern involved the issue of criminal libel. During the vigorous debate, Mr. Nathan Sanford [11] is noted as saying: “that he conceived it to be of great importance that the freedom of speech and of the press should be secured by the constitution. The freedom of the press is the best security of public liberty; and this truth, so familiar to us all, has become an acknowledged maxim, which requires no discussion. The liberty of the press in this state, now depends upon the pleasure of the legislature. The existing law of the state upon that subject may be at any time repealed, and any other regulation abridging the rights of the citizens in this respect, may be substituted.”[12] Indeed, according to one State constitutional scholar, “[t]he explicit reason [for enacting article I, § 8] was to prevent the legislature from restricting these freedoms by statute.”[13] Article I, § 8 passed by a vote of 97 to 8.
But freedom of the press in New York State enjoys a history dating back long before the New York State Constitutional *149 Convention of 1821 and, indeed, before the adoption of the 1st Amendment to the US Constitution. In 1735, John Peter Zenger published the Weekly Journal, a New York newspaper, that was highly derogatory of the New York colonial governor, who quickly shut it down. After being arrested on charges of seditious libel, Zenger admitted publishing the criticism. He stated that what he published was the truth which, at that time, was not recognized as a legal defense. Despite the Judge’s instruction, the jury, in acquitting Zenger, refused to enforce a law that made it a crime to criticize the government, thus laying New York’s foundation for freedom of the press. (See, People v Douglas, 178 Misc 2d 918 [Sup Ct, Bronx County 1998] [dealing with the issue of jury nullification].)
In People v Croswell (3 Johns Cas 337 [NY Sup Ct 1804]), the defendant was indicted for a libel upon President Thomas Jefferson. After hearing the evidence, Chancellors Kent and Thompson held that truth should be received in evidence and that the jury should judge both the facts and the law.[14] In his learned and exhaustive opinion, Chancellor Kent stated:
“[W]hatever may be our opinion on the English law, there is another and a very important view of the subject to be taken, and that is with respect to the true standard of the freedom of the American press. In England they have never taken notice of the press in any parliamentary recognition of the principles of the government, or of the rights of the subject, whereas the people of this country have always classed the freedom of the press among their fundamental rights. This I can easily illustrate by a few examples.
“The first American congress, in 1774, in one of their public addresses, (Journals, vol. 1, p. 57,) enumerated five invaluable rights, without which a people cannot be free and happy, and under the protecting and encouraging influence of which these colonies had hitherto so amazingly flourished and increased. One of these rights was the freedom of the press, and the importance of this right consisted, as they observed, ‘besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed or intimidated into more honorable and just modes of conducting affairs.’ The next *150 high authority I shall mention, is the Convention of the people of this state, which met in 1788. They declared[,] unanimously, (Journals, pp. 44, 51, 52, 73, 74,) that the freedom of the press was a right which could not be abridged or violated. The same opinion is contained in the amendment to the constitution of the United States, and to which this state was a party. It is also made an article in most of the state constitutions, that the liberty of the press was essential to the security of freedom, and ought to be inviolably preserved.” (People v Croswell, supra, at 390-391 [emphasis in bold supplied].)
In April 1804 the Legislature sent to the Council of Revision a bill framed along the lines of Kent’s opinion in Croswell’s case. After some minor revision, the bill passed both houses unanimously and became law on April 6, 1805. In 1821, the Convention incorporated the substance of the statute into the organic law of the State.[15]
It is worthy to note that Croswell’s attorney was New York’s Alexander Hamilton.[16] At the New York State Constitutional Convention of 1821, Chancellor Kent, author of the opinion in Croswell’s case (supra), said of Hamilton’s closing statement: “that a more able and eloquent argument was perhaps never heard in any court.”[17] Indeed, at the close of his written opinion in Croswell, Chancellor Kent “adopted as perfectly correct ‘the comprehensive and accurate definition of one of the counsel at the bar (General Hamilton) that the liberty of the press consists in the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects government, magistracy or individuals.’ ”[18] Not only a tireless defender of freedom of the press in New York, Hamilton also served as a New York State delegate to the Federal Constitutional Convention and was the only delegate from New York to sign the United States Constitution.[19]
This history points to the unmistakable conclusion that our State’s constitutional free press provision, with roots deeper and older than those of the Federal Constitution’s 1st Amendment, forms an appropriately independent State constitutional basis for evaluating Civil Rights Law § 52.
*151 E. Civil Rights Law § 52
Freedom of the press, of such paramount importance that it is specifically secured in the State Constitution, is restrained and abridged by Civil Rights Law § 52.
It reads as follows:
“§ 52. Televising, broadcasting or taking motion pictures of certain proceedings prohibited
“No person, firm, association or corporation shall televise, broadcast, take motion pictures or arrange for the televising, broadcasting, or taking of motion pictures within this state of proceedings, in which the testimony of witnesses by subpoena or other compulsory process is or may be taken, conducted by a court, commission, committee, administrative agency or other tribunal in this state; except that the prohibition contained in this section shall not apply to public hearings conducted by the public service commission with regard to rates charged by utilities, or to proceedings by either house of the state legislature or committee or joint committee of the legislature or by a temporary state commission which includes members of the legislature, so long as any testimony of witnesses which is taken is taken without resort to subpoena or other compulsory process, if (1) the consent of the temporary president of the senate or the speaker of the assembly, in the case of the respective houses of the state legislature, or the chairman, in the case of such a committee or commission, and a majority of the members thereof present at such proceedings, shall have been first obtained, provided, however, that in the case of the public rate hearings of the public service commission, it shall be sufficient to obtain the consent of the presiding officer, (2) the written consent of the witness testifying at the time shall have been obtained, prior to the time of his testifying, and (3) it has been determined by such presiding officer or chairman and such majority of the members that it is in the public interest to permit the televising, broadcasting or taking of motion pictures.
“Any violation of this section shall be a misdemeanor.
“(Added L.1952, c. 241, § 1; amended L.1962, c. 706, § 1; L.1976, c. 352, § 1.)”
That this nearly 50-year-old statute “restraints]” and “abridge [s] the liberty * * * of the press” (NY Const, art I, § 8) is unambiguous. Print media may report with its tools — pen and paper. But radio and television are limited and restricted, i.e. “restrained” and “abridged,” from reporting with their tools — the audible word and the visible image. By its language *152 Civil Rights Law § 52 controls how television and. radio journalists may report the trial; it diminishes and reduces the scope of their coverage. Such impact constitutes, by definition, “restraint” and “abridgement.” Indeed, the statute’s own legislative history supports the conclusion that Civil Rights Law § 52 is unconstitutional.
There is virtually no mention whatsoever of New York State Constitution, article I, § 8 in any of the documents pertaining to bill No. 266 (later Civil Rights Law § 52), initially presented to the New York State Senate on January 14, 1952. With the exception of a Western Union telegram from Harold Fellows, President of the National Association of Radio and Television Broadcasters, to Governor Thomas E. Dewey, dated March 25, 1952, urging the Governor to veto the bill, wherein Mr. Fellows mentions that “[t]his subject involves many basic public interests and constitutional considerations,”[20] there is no other mention of the word “Constitution” anywhere in the legislative history. Much of the debate surrounding bill No. 266 involved the televising and radio broadcasting of “committee and other governmental hearings.”[21] Repeatedly throughout the bill’s documentary history, proponents and opponents focused their discussion on the presence of cameras and microphones on the floor of the Assembly and Senate during hearings. From the documents reviewed by this court, there is no mention, much less debate, of the issue of cameras and microphones in courtrooms.
When the statute was amended in 1962, the restrictions on televising and broadcasting were lessened by adding language permitting cameras on the floor of either house of the New York State Legislature under certain conditions. Again, there is scant mention of article I, § 8 or the statute’s application to judicial proceedings in any documents pertaining to the 1962 amendment to Civil Rights Law § 52. Indeed, in his memorandum to Governor Rockefeller regarding legal objections to the proposed bill, Attorney General Louis J. Lefkowitz, finding “no legal objection to this bill,” failed to even comment on whether the amendment then being proposed, or whether section 52 *153 itself, had constitutional implications.[22] In a letter to the Honorable Robert McCrate, Counsel to the Governor, in opposition to the bill, Mortimer Weinbach, Vice-President of the American Broadcasting Company, wrote: “Our opposition is based upon the premise that its enactment into law would deny to the broadcasting medium of communication the freedom, right and privilage [sic] of covering public proceedings otherwise available to the press. Such denial would, in our opinion, be in contravention of the First Amendment to the United States Constitution and to Article I, Section 8 of the New York State Constitution, which prohibits the passage of any law which would restrain or abridge the liberty of speech or of the press.”[23]
This letter opposing the amendment to section 52 is the single piece of documentation submitted to the Legislature in connection with either proposed bill No. 266 in 1952 or the amendment to section 52 in 1962 that mentions the constitutionally protected freedom of the press. Mindful that “a legislative enactment carries with it an exceedingly strong presumption of constitutionality’ (Matter of Malpica-Orsini, 36 NY2d, supra, at 570), this court is at a loss to understand how the Legislature could possibly have enacted a statute so unambiguously violative of the otherwise clear language of the State Constitution without so much as a footnote justifying its action. It is possible that some of the documentary legislative history has been lost over the years and is no longer available for this court to review. Even assuming the absence of some evidence, this court nevertheless concludes that Civil Rights Law § 52 is unconstitutional and that the presumption of constitutionality has been overcome beyond a reasonable doubt. (See, Matter of Malpica-Orsini, supra.) The presumption referred to in Matter of Malpica-Orsini (supra, at 571), that “the Legislature has investigated and found facts necessary to support the legislation * * * as well as the existence of a situation showing or indicating its need or desirability,” is simply not borne out by the legislative history available to this court. Nor can this court assume “any state of facts” (Matter of Malpica-Orsini, supra, at 571) that would justify the law in light of the language of article I, § 8.
Faced with a motion seeking the drastic remedy of declaring a statute unconstitutional, this court must carefully consider *154 not only legislative intent and constitutional principles, but judicial precedent as well.
F. Court of Appeals Case Law
In O’Neill v Oakgrove Constr. (71 NY2d 521 [1988]), the New York Court of Appeals elaborated on the history behind article I, § 8 of the New York Constitution. For the first time the Court found that the protections contemplated by article I, § 8 are broader than those contemplated by the 1st Amendment of the Federal Constitution: “The expansive language of our State constitutional guarantee (compare, NY Const, art I, § 8, with US Const 1st Amend), its formulation and adoption prior to the Supreme Court’s application of the First Amendment to the States (compare, NY Const of 1821, art VII, § 8; and Brandreth v Lance, 8 Paige 24 [1839], with Near v Minnesota, 283 US 697 [1931] — [citing Brandreth v Lance and other New York cases with approval, id., at 719, n 11]), the recognition in very early New York history of a constitutionally guaranteed liberty of the press (see, Jay, Address to the People of the State of New York, May 1788, 3 American Museum [No. 6] 559 [1792], reprinted in 3 Roots of the Bill of Rights, at 554, 560 [Schwartz ed]; Smith, Address to the People of the State of New York, May 1788 — Postscript [agreeing with Jay on that point], reprinted in id., at 566, 576), and the consistent tradition in this State of providing the broadest possible protection to ‘the sensitive role of gathering and disseminating news of public events’ (Matter of Beach v Shanley, 62 NY2d 241, 256 [Wachtler, J., concurring]), all call for particular vigilance by the courts of this State in safeguarding the free press against undue interference.” (O’Neill v Oakgrove Constr., at 528-529.) “The protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment (see, People ex rel. Arcara v Cloud Books, 68 NY2d 553, 557-558; Matter of Beach v Shanley, 62 NY2d 241, 255 [Wachtler, J., concurring]; Bellanca v New York State Liq. Auth., 54 NY2d 228, 235). Article I, § 8 of the Constitution assures, in affirmative terms, the right of our citizens to ‘freely speak, write and publish’ and prohibits the use of official authority which acts to ‘restrain or abridge the liberty of speech or of the press’.” (O’Neill v Oakgrove Constr., at 529, n 3.)
This notion has been repeatedly expressed by the Court of Appeals. In Immuno AG. v Moor-Jankowski (77 NY2d 235 [1991]), then Judge Kaye, writing for the majority, concluded that the New York State Constitution provides more protection for speech than does the 1st Amendment to the United States *155 Constitution. In reaching this conclusion, Judge Kaye wrote that: “This State, a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas (Matter of Beach v Shanley, 62 NY2d 241, 255-256 [Wachtler, J., concurring]). That tradition is embodied in the free speech guarantee of the New York State Constitution, beginning with the ringing declaration that ‘[e]very citizen may freely speak, write and publish * * * sentiments on all subjects.’ (NY Const, art I, § 8.) Those words, unchanged since the adoption of the constitutional provision in 1821, reflect the deliberate choice of the New York State Constitutional Convention not to follow the language of the First Amendment, ratified 30 years earlier, but instead to set forth our basic democratic ideal of liberty of the press in strong affirmative terms (see, Forkosch, Freedom of the Press: Croswell’s Case, 33 Fordham L Rev 415 [1965]).” (Immuno AG. v Moor-Jankowski, at 249.)
As cited by Judge Kaye in Immuno (supra), this idea was the focus of a concurring opinion written by Judge Wachtler some years earlier in Matter of Beach v Shanley (62 NY2d 241, 255-256 [1984], supra):
“This State has long provided one of the most hospitable climates for the free exchange of ideas. The tradition existed in colonial times, as is exemplified by the acquittal in 1735 of John Peter Zenger who, interestingly, was prosecuted for publishing articles critical of the New York colonial Governor after he refused to disclose his source (23 Encyclopaedia Britannica [1956 ed], p 944; Hentoff, The First Freedom [1980], pp 63-68). In the 19th century a large portion of the publishing industry was established in New York and the State began to serve as a cultural center for the Nation. It still enjoys that status.
“It is consistent with that tradition for New York to provide broad protections, often broader than those provided elsewhere, to those engaged in publishing and particularly to those performing the sensitive role of gathering and disseminating news of public events.”
G. Recent New York Courts’ Decisions
In a decision dated January 25, 2000 departing from two recent New York State trial court holdings, the Honorable Joseph C. Teresi, a New York State Supreme Court Justice in Albany County, declared Civil Rights Law § 52 unconstitutional. (People v Boss, 182 Misc 2d 700 [Sup Ct, Albany County 2000], supra.) In rejecting the recent decisions in Matter of Clear Channel Communications (Albany County Ct, Mar. 3, *156 1999, Rosen, J.) and Matter of Regional News Network (Sup Ct, Bronx County, June 4, 1999, Williams, J., No. 1814/99), Justice Teresi found as follows:
“In Matter of Clear Channel Communications (Albany County Ct, Mar. 3, 1999, Rosen, J.), a holding adopted by Justice Williams in Matter of Regional News Network (Sup Ct, Bronx County, June 4, 1999, No. 1814/99), the court found that: ‘CCCI’s argument against the constitutionality of §521 [sic] on free speech and equal protection grounds can only be categorized by this Court as comprehensive and extraordinarily persuasive.’
“Judge Rosen went on to state: ‘This Court cannot help but basically agree that the Holmesian “felt necessitates of time” have not well treated §52’s original intent. It has been powerfully argued, in [CCCI’s] submission, that §52 of the Civil Rights Law is hopelessly anachronistic and needs a permanent shelving, not merely the just completed ten (10) year experimental amendment. This court can hardly envision any serious argument that a rational basis can be crafted to justify what appears to be clear discrimination against the electronic media.’ (Supra.)
“However, that court reluctantly denied the request to strike down Civil Rights Law §52 and referred the matter for legislative action. This court respectfully disagrees. If section 52 is no longer constitutional, it is for the courts to say so not to defer to a political body where the nuances of .politics can and have led to unnecessary inaction.” (People v Boss, supra, at 703 [emphasis added].)
Justice Teresi went on to state that: “This court is not holding there is an unfettered right to televise all aspects of every proceeding. However, this court does find that section 52 of the Civil Rights Law, as an absolute ban on audio-visual coverage in the courtroom, is unconstitutional.” (People v Boss, supra, at 705.)
Several other State trial courts in addition to Justice Teresi have faced this issue in the past several months and have allowed cameras into their courtrooms: the Honorable John Brunetti, Acting Justice of the Supreme Court, Onondaga County, has issued a standing decision and order relative to cameras in the courtroom for nontestimonial proceedings, and the Honorable Dan Lamont, Supreme Court Justice, Albany County, allowed cameras into the courtroom in People v Straw- *157 bridge, one day after Justice Teresi’s decision.[24] Thus this court is but one of many to recognize the supremacy of article I, § 8 over Civil Rights Law § 52.
H. Fair Trial Considerations
Absent Civil Rights Law § 52, there is no authority preventing this court from allowing cameras to be present during this trial. As with any court proceeding, however, it is up to the court to balance the defendant’s constitutional right to a fair trial with the constitutional right to freedom of the press.
In 1987 the New York State Legislature enacted section 218 of the Judiciary Law which approved an 18-month experiment that, with the trial court’s permission, allowed for audio and video coverage of both criminal and civil trial proceedings. After 10 years of legislative reenactments, what began as an 18-month experiment became customary. Indeed, on June 21, 1993, this court conducted a murder trial that involved the death of three victims while a camera was present in the courtroom.[25] In 1990, Monroe County was the site of a highly publicized and televised trial of serial killer Arthur Shawcross.[26] Convictions on both cases were affirmed. There was no finding of prejudice to the fair trial rights of these defendants because of coverage by the broadcast media. Despite the many commissioned reports[27] to the Legislature recommending permanent adoption of Judiciary Law § 218, on June 30, 1997, the Legislature failed to reenact it and, thus, by operation of law, Civil Rights Law § 52 was resuscitated. The sun set on Judiciary Law § 218 and shone again on Civil Rights Law § 52.
Aside from the firsthand experience provided by the “experimental years,” since the 1960s courts have accepted the notion that there would come a day when cameras could be present in *158 a courtroom without interfering with a defendant’s fundamental due process rights. In Estes v Texas (381 US 532 [1965]), the United States Supreme Court held that the defendant had been denied due process as a result of the televising of his trial and certain pretrial hearings. Writing for the majority, Justice Clark stated that sometimes “a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.” (Estes v Texas, supra, at 542-543.) With six separate opinions, however, the Estes holding is a fact-specific due process rejection of televised coverage and not a general ban based upon presumptive prejudice.[28] Thus, the Estes Court left open the question of whether the Constitution absolutely prohibited the televising of trials stating that: “When the advances in [technology] permit reporting by * * * television without [its] present hazards to a fair trial we will have another case.” (Estes v Texas, supra, at 540.) Echoing this notion in his concurring opinion, Justice Harlan stated: “[W]e should not be deterred from making the constitutional judgment which this case demands by the prospect that the day may come when television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process. If and when that day arrives the constitutional judgment called for now would of course be subject to re-examination in accordance with the traditional workings of the Due Process Clause.” (Estes v Texas, supra, at 595-596 [Harlan, J., concurring].)
By 1978, six States had adopted rules permitting in-court cameras, and 10 other States, led by Florida, had experimented with programs to televise trials.[29] In 1981, the Supreme Court revisited the issue in Chandler v Florida (449 US 560 [1981]) and held that subject to certain safeguards a State may permit electronic media and still photography coverage of public criminal proceedings over the objection of the accused. In so holding, the Court concluded that “Estes did not announce a constitutional rule that all photographic or broadcast coverage of criminal trials is inherently a denial of due process” and the Court declined to promulgate such a “per se rule.” (Chandler v Florida, supra, at 574.) Thus, after Estes (supra) and Chandler, the Supreme Court, “with Solomon-type wisdom,” has decided that the Constitution neither prohibits nor mandates televised *159 coverage of trial proceedings where there are safeguards in place to ensure the court can honor defendant’s right to a fair trial and there is no showing of specific prejudice.[30]
In 1984, the Second Circuit Court of Appeals in Westmoreland v Columbia Broadcasting Sys. (752 F2d 16, 23 [2d Cir 1984]) expanded on the Supreme Court’s predictions for the technology of the future: “There may indeed come a time when the ‘experimentation,’ Chandler v. Florida, 449 U.S. at 574, 101 S.Ct. at 809, with television coverage establishes that the concerns with expenditure of judicial time on administration and oversight of broadcasting; the necessity of sequestering juries so that they will not look at the television program of the trial itself; the difficulty in empaneling an impartial jury in the case of a retrial; the necessity of larger jury panels or increased use of marshals; the psychological effects on witnesses, jurors, lawyers, and judges; and related considerations of ‘solemnity,’ ‘dignity,’ and the like are considered secondary or basically irrelevant as impediments to the search for truth when a given case is televised. At such a time the presumption may well be that all trials should be televised, or televisable, at least where the parties agree.”[31]
Finally, in Katzman v Victoria’s Secret Catalogue (923 F Supp, supra, at 589), after careful analysis of Federal precedent, the court concluded that: “Twelve years after the Westmoreland decision and twenty-two years after the Estes holding, the advances in technology and the above-described experiments have demonstrated that the stated objections can readily be addressed and should no longer stand as a bar to a presumptive First Amendment right of the press to televise as well as publish court proceedings, and of the public to view those proceedings on television.” Although Katzman was a civil case and although its holding is not binding on this court, it does serve as persuasive authority suggesting that because of technological developments in recent years we have reached “the day” when cameras can be present in a courtroom while still protecting the rights of the parties, especially a criminal defendant.
Neither Justice Teresi’s decision to declare Civil Rights Law § 52 unconstitutional, the instant decision, nor any other trial *160 court’s decision on this issue should be read to stand for the proposition that the press’ right to enter the courtroom with their cameras and recording equipment is unfettered. Rather, the Trial Judge, charged with the duty to maintain an orderly proceeding, may impose reasonable guidelines for the media to follow. As the Supreme Court said in Richmond Newspapers (supra): “Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic * * * so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial.” (Richmond Newspapers v Virginia, 448 US, supra, at 581, n 18 [citation omitted].) Although New York courts have yet to examine the issue of time, place and manner restrictions on the press’ article I, § 8 rights, in the context of a public courtroom, New York courts have dealt with restrictions on the fundamental right to free speech and have upheld such restraints as valid time, place and manner restrictions so long as the limitations are “reasonable and rationally related to legitimate State interests” and are “ ‘applicable to all speech irrespective of content’.” (See, Matter of von Wiegen, 63 NY2d 163, 171, 171-172 [1984] [pertaining to restrictions on commercial speech].)
I. Still Photography
Intervenor Gannett Co. contends that “the Court need not address the constitutionality of Civil Rights Law §52 to permit a Democrat and Chronicle photographer to take still photographs during the trial because §52 addresses only ‘motion pictures.’ ” (See, intervenor Gannett Co.’s letter to court dated Mar. 14, 2000.) As a matter of fundamental statutory construction, Gannett’s argument is persuasive since the plain language of section 52 is devoid of any mention of “still photography.” Nor is there any discussion in the legislative history as to whether still photography was contemplated by the lawmakers. There was no case law on this issue until Judiciary Law § 218 was passed allowing for the experimental period. (See, Matter of Oles v Houston [138 Misc 2d 1075 (Civ Ct, NY County 1988)] dealing with whether Judiciary Law § 218 contemplated still cameras. That court decided that still photography was within the scope of Judiciary Law § 218.) Thus, this court agrees with Gannett Co. and decides that the plain language of Civil Rights Law § 52 does not apply to the taking of still photographs and images. Moreover, even if the spirit of Civil Rights Law § 52 could be found to encompass the taking of such still images, then it is nevertheless constitutionally infirm for the reasons stated hereinbefore. *161 J. Guidelines for Media Presence at Instant Proceedings to Assure a Fair Trial
By declaring Civil Rights Law § 52 unconstitutional, it is incumbent upon this court to institute standards and safeguards to be utilized for the audio-visual coverage of this case designed to protect the rights of all parties to a fair trial. Movants have offered to be bound by Judiciary Law former § 218 and the Rules of the Chief Administrator of the Courts (22 NYCRR part 131 [Audio-Visual Coverage of Judicial Proceedings]). Those guidelines well served fair-trial interests during the 10-year experiment with cameras in the courtroom. To the best of this court’s knowledge, not a single conviction in any case where cameras were permitted in the courtroom resulted in a reversal due to the camera’s presence compromising the defendant’s fair trial rights.
Accordingly, audio-visual coverage, unless otherwise ordered by this court, shall be subject to the court’s guidelines, which contain language tailored to the specifics of this case, but otherwise identical to 22 NYCRR part 131.
Conclusion
For the reasons stated above, the motion of the “intervenors” must be, and hereby is, granted.
[Portions of opinion omitted for purposes of publication.]

. US Const 5th, 6th, 14th Amends; NY Const, art I, § 6.

. Richmond Newspapers v Virginia, 448 US 555, 573 (1980); see also, Gannett Co. v DePasquale, 443 US 368, 384-386, 386, n 15, and at 423 (concurring and dissenting opn) (1979).

. US Const 1st Amend.

. NY Const, art I, § 8.

. This number includes States with permanent rules as well as those with experimental rules. Of the 48 States that allow cameras, 35 of them allow cameras in criminal trials. (See, People v Boss, 182 Misc 2d 700, 705 [Sup Ct, Albany County 2000]; see also, Summary of TV Cameras in the State Courts, Information Serv, Natl Ctr for State Cts, Mar. 27, 1997.)

. Lassiter, TV or Not TV — That is the Question, 86 J of Grim L & Criminology 928, 932 (1996).

. TV or Not TV, op. cit.; see also, Greenhouse, Reversing Course, Judicial Panel Allows Television in Appeals Courts, NY Times, Mar. 13, 1996, at A-14, col 2.

. The United States Court of Appeals for the Third Circuit is still considering the matter. The Ninth Circuit instituted experimental pilot programs, while most other Federal appellate courts, such as the Fifth Circuit, have chosen to continue a nonbroadcast policy.

. Rule 53 was enacted in 1944. It is a sign of its age that it refers to “photographs” and nowhere mentions the nonphotographic digital imaging system used now by the television broadcasting media and, in many cases, by “photographers” for the print media.

. New York State’s founding fathers found it necessary, evidently, to conduct business on Saturdays.

. Mr. Sanford was a delegate from New York County.

. Carter and Stone, Reports of the Proceedings and Debates of the Convention of 1821, Assembled for. the Purpose of Amending the Constitution of the State of New York, at 491 (E. & E. Hosford, Albany 1821).

. Galie, The New York State Constitution: A Reference Guide, at 51 (1991). , t

. Dougherty, Constitutional History of the State of New York, at 115 (2d ed, Neale Publ. Co., NY 1915).

. Constitutional History of the State of New York, op. cit., at 115-116.

. Croswell’s case (supra) was one of the last cases argued by Alexander Hamilton, who died on July 12, 1804.

. Constitutional History of the State of New York, op. cit, at 116, n 11.

. Constitutional History of the State of New York, op. cit., at 116, n 11.

. John Lansing and Robert Yates, the two other delegates from New York State, did not sign the Federal Constitution.

. Telegram from Harold E. Fellows, President of National Assn of Radio & Television Broadcasts, to Governor Thomas E. Dewey, dated Mar. 25, 1952, Bill Jacket, L 1952, ch 241, at 3.

. Telegram from Joseph H. McConnell, President of National Broadcasting Co., to Governor Thomas E. Dewey, dated Mar. 26, 1952, Bill Jacket, L 1952, ch 241, at 6.

. Mem from Attorney General Louis J. Lefkowitz to Governor Rockefeller, dated Apr. 16, 1962, Bill Jacket, L 1962, ch 706, at 9.

. Letter from Mortimer Weinbach, Vice-President of American Broadcasting Co., to Robert McCrate, Counsel to Governor Rockefeller, dated Apr. 9, 1962, Bill Jacket, L 1962, ch 706, at 20.

. Judge David Egan, Monroe County Court, in People v Duval and Judge Patricia Marks, Monroe County Court, in People v Capozzi, both declined to grant media applications to broadcast those proceedings. But their unpublished decisions were based on the untimeliness of the applications, not on the constitutional issue which was not addressed by those courts.

. People v Etheriage Pierce, trial began on June 21,1993.

. Trial began on September 17, 1990 and was presided over by the Honorable Donald J. Wisner, then Monroe County Court Judge. Defendant’s conviction was unanimously upheld on appeal: 192 AD2d 1128 (4th Dept 1993), lv denied 82 NY2d 726 (1993).

. Report of Chief Administrative Judge Albert M. Rosenblatt (1989); report of Chief Administrator of the Courts Matthew T. Crosson (1991); analysis by Justice Burton Roberts’ committee created by the Legislature (1994); and analysis by Dean John Feerick’s committee (1997).

. Lassiter, TV or 'Not TV — That is the Question, 86 J of Grim L & Criminology 928, 938 (1996).

. TV or Not TV- — That is the Question, op. cit., at 940.

. TV or Not TV — That is the Question, op. cit., at 942.

. As of the date of this decision, the court has overseen individual voir dire of approximately 352 prospective jurors. All of them have indicated under oath that radio and television coverage (which excludes their images and identities) would have no negative impact on their respective abilities to be fair and impartial jurors.